# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP59 |

| | |
|---|---|
| COMPLETE TITLE: | Clean Wisconsin, Inc. and Pleasant Lake Management District, |
| | Petitioners-Respondents, |
| | v. |
| | Wisconsin Department of Natural Resources, |
| | Respondent-Appellant, |
| | Wisconsin Manufacturers & Commerce, Dairy Business Association, Midwest Food Processors Association, Wisconsin Potato & Vegetable Growers Association, Wisconsin Cheese Makers Association, Wisconsin Farm Bureau Federation, Wisconsin Paper Council and Wisconsin Corn Growers Association, |
| | Intervenors-Co-Appellants, |
| | Wisconsin Legislature, |
| | Intervenor. |

### ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 8, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 12, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Valerie Bailey-Rihn |

JUSTICES:

DALLET, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ANN WALSH BRADLEY, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ROGGENSACK, J., joined.
NOT PARTICIPATING:
HAGEDORN, J., did not participate.

ATTORNEYS:

For the intervenor, there were briefs filed by *Eric M. McLeod*, *Kirsten A. Atanasoff, Lisa M. Lawless*, and *Husch Blackwell LLP*, Madison and Milwaukee. There was an oral argument by *Eric M. McLeod*.

For the intervenors-co-appellants, there were briefs file by *Robert I. Fassbender* and *Great Lakes Legal Foundation*, Madison. There was an oral argument by *Robert I. Fassbender*.

For the petitioners-respondents, there was a brief file by *Carl A. Sinderbrand* and *Axley Brynelson, LLP*, Madison. There was an oral argument by *Carl Sinderbrand*.

For the respondent-appellant, there was a brief filed by *Gabe Johnson-Karp* and *Jennifer L. Vandermeuse* assistant attorneys general; with whom on the brief was *Joshua L. Kaul*, attorney general, Madison. There was an oral argument by *Gabe Johnson-Karp*.

An amicus curiae brief was filed on behalf of Central Sands Water Action Coalition by *Andrea Gelatt, Rob Lundberg, Adam Voskuil,* and *Midwest Environmental Advocates*, Madison.

An amicus curiae brief was filed on behalf of Wisconsin Trout Unlimited, Inc. by *Henry E. Koltz* and *Schmidt, Darling & Erwin*, Milwaukee.

No. 2018AP59
(L.C. Nos. 2016CV2817, 2016CV2818, 2016CV2819, 2016CV2820, 2016CV2821,
2016CV2822, 2016CV2823, 2016CV2824)

STATE OF WISCONSIN      :      IN SUPREME COURT

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

Clean Wisconsin, Inc. and Pleasant Lake
Management District,

      Petitioners-Respondents,

   v.

Wisconsin Department of Natural Resources,

      Respondent-Appellant,

Wisconsin Manufacturers & Commerce, Dairy
Business Association, Midwest Food Processors
Association, Wisconsin Potato & Vegetable
Growers Association, Wisconsin Cheese Makers
Association, Wisconsin Farm Bureau Federation,
Wisconsin Paper Council and Wisconsin Corn
Growers Association,

      Intervenors-Co-Appellants,

Wisconsin Legislature,

      Intervenor.

**FILED**

**JUL 8, 2021**

Sheila T. Reiff
Clerk of Supreme Court

---

DALLET, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ANN WALSH BRADLEY, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ROGGENSACK, J., joined.

HAGEDORN, J., did not participate.

APPEAL from a judgment and an order of the Circuit Court for Dane County, Valerie Bailey-Rihn, Judge. *Modified and affirmed, and, as modified, cause remanded.*

¶1 REBECCA FRANK DALLET, J. One of the Department of Natural Resources' (DNR) many responsibilities is to evaluate applications to operate high capacity groundwater wells. For certain wells, the DNR must follow a specific environmental review process before approving the application. For all other wells, that process is not required, although the DNR sometimes still considers the potential environmental effects of a proposed well when evaluating the well's application. The eight well applications at issue here fall into the latter category: a formal environmental review was not required, but the DNR had information that the wells would negatively impact the environment. Despite that knowledge, the DNR approved the applications after concluding it had no authority to consider the proposed wells' environmental effects.

¶2 Clean Wisconsin, Inc. and the Pleasant Lake Management District (collectively, "Clean Wisconsin") appealed that decision to the circuit court.[1] They argued that the DNR's decision was contrary to Lake Beulah Management District v. DNR, 2011 WI 54, 335 Wis. 2d 47, 799 N.W.2d 73, where we held that the DNR had the authority and discretion to consider the

---

[1] The Honorable Valerie Bailey-Rihn of the Dane County Circuit Court presided.

environmental effects of all proposed high capacity wells. The DNR argued that Lake Beulah is no longer good law because Wis. Stat. § 227.10(2m) (2019-20),[2] enacted at roughly the same time we decided Lake Beulah, limits an agency's actions to only those "explicitly required or explicitly permitted by statute or by a rule," and, for these wells, a formal environmental review was not required under Wis. Stat. § 281.34.[3] Thus, the question presented is whether § 227.10(2m) commands a different conclusion here than in Lake Beulah. The circuit court decided that it does not and we agree. We hold that the DNR erroneously interpreted the law when it concluded it had no authority to consider the environmental effects of the eight wells at issue here. Accordingly, we affirm the circuit court's order with the modification that the circuit court remand all eight well applications to the DNR.

I

¶3 Consolidated in this case are eight permit applications for high capacity wells, all of which were filed

---

[2] All references to the Wisconsin Statutes are to the 2019-20 version.

[3] The DNR "shall review" a well application "using the environmental review process in its rules" when a proposed well is "located in a groundwater protection area," loses more than 95 percent of the water it withdraws, or "may have a significant environmental impact on a spring." Wis. Stat. § 281.34(4)(a).

between March 2014 and April 2015.[4] At the time, and consistent with our holding in Lake Beulah, the DNR's common practice was to review environmental-impact information for most high capacity well applications, regardless of whether Wis. Stat. § 281.34(4)(a) required such a review. If the review revealed that the proposed well would cause adverse environmental effects, the DNR would either deny the application or place it "on hold," neither denying nor approving it. For all eight wells at issue here, the DNR flagged the applications for further review of their potential environmental impacts. For seven of the wells,[5] it completed that review and determined that approving the well would adversely affect waters covered by the public trust doctrine.[6] The DNR then placed all eight well applications on hold.

---

[4] The well owners and respective case numbers are: Lutz, 2016CV2817; Pavelski, 2016CV2818; Peplinski, 2016CV2819; Frozene, 2016CV2820; Turzinski, 2016CV2821; Laskowski, 2016CV2822; Lauritzen, 2016CV2823; Derousseau, 2016CV2824. There is no dispute that all eight wells are "high-capacity wells" as defined in Wis. Stat. § 281.34(1)(b).

[5] A DNR scientist had recommended investigating the Turzinski well's effect on the headwaters of a nearby creek, but the DNR approved the application before collecting any evidence on those potential effects.

[6] Rooted in the Wisconsin Constitution, the public trust doctrine requires the state to protect its "navigable waters" for the public's benefit. See Wis. Const. art. IX, § 1; Movrich v. Lobermeier, 2018 WI 9, ¶¶25-29, 379 Wis. 2d 269, 905 N.W.2d 807.

¶4 While those applications were on hold, the DNR's well-approval process changed. In 2016, then-Attorney General Brad Schimel released an opinion regarding Wis. Stat. § 227.10(2m) and its effect on the DNR's well-permit authority and our holding in Lake Beulah. The Attorney General's opinion concluded that this court did not address § 227.10(2m) in Lake Beulah and that, after the enactment of § 227.10(2m), the DNR had no authority to impose specific permit conditions that were not explicitly listed in a relevant statute. See Opinion of Wis. Att'y Gen. to Robin Vos, Assembly Committee on Organization Chairperson, OAG-01-16, ¶2 (May 10, 2016). He read Lake Beulah as holding that the legislature had "impliedly delegated" to the DNR broad, public-trust authority, which could not withstand § 227.10(2m):

> Although the Lake Beulah Court found that DNR had broad implied authority to impose permit conditions, 335 Wis. 2d 47, ¶3, that holding now directly conflicts with Act 21. I conclude that through Wis. Stat. §§ 227.10(2m) [and 227].11(2)(a), the Legislature has limited DNR's authority to regulate high capacity wells only as explicitly enumerated through statute or rule. DNR cannot premise such authority on broad statements of policy or general duty, such as those found in Wis. Stat. §§ 281.11-.12.

OAG-01-16, ¶31 (footnote omitted). The DNR adopted this opinion and began approving most of the applications it had placed on hold. And, despite its having evidence that some of those proposed wells would adversely affect public-trust waters, the DNR generally imposed no permit conditions to protect those waters. The DNR also stopped reviewing the potential

5

environmental effects of proposed wells except when such a review was required under Wis. Stat. § 281.34(4). Under this new approach, and despite its prior determination that the wells at issue here would adversely affect public-trust waters, the DNR approved all eight well applications without any conditions.

¶5 Clean Wisconsin appealed each approval to the circuit court under Wis. Stat. ch. 227. Clean Wisconsin argued that the DNR approved those wells based upon an erroneous legal determination that it had no authority outside of Wis. Stat. § 281.34(4) to consider the environmental effects of a proposed high capacity well. Citing Lake Beulah for support, Clean Wisconsin argued that the DNR has both a public-trust duty and the express statutory authority to consider the environmental impact of all proposed high-capacity wells. The DNR countered that Lake Beulah did not control for two reasons: (1) it was "decided incorrectly" because it "amalgamat[ed]" an "implied" authority for the DNR to review a proposed well's environmental effects rather than looking to the statutes' explicit text; and (2) per the Attorney General's 2016 opinion, Wis. Stat. § 227.10(2m) negated Lake Beulah's holding. Several business associations intervened and urged the circuit court to find that the DNR had properly approved the well applications.[7] These

---

[7] The intervenors at the circuit court were Wisconsin Manufacturers and Commerce, Dairy Business Association, Midwest Food Products Association, Wisconsin Potato and Vegetable Growers Association, Wisconsin Cheese Makers Association, Wisconsin Farm Bureau Federation, Wisconsin Paper Council, and Wisconsin Corn Growers Association.

6

associations argued that ruling otherwise would create a permit system without standards and leave applicants without clear guidance about which applications would be further reviewed for their potential environmental impact.

¶6 The circuit court agreed with Clean Wisconsin that Lake Beulah applied and that the DNR erred in determining it could not consider the environmental effects of all proposed high capacity wells. The circuit court pointed to a footnote in Lake Beulah in which we briefly mentioned that Wis. Stat. § 227.10(2m) did not affect our analysis. It then explained that the DNR, the business associations, and the Attorney General's opinion raised arguments that we had rejected in Lake Beulah. Having concluded that the DNR was bound by Lake Beulah, the circuit court found that "[a]bsent the Attorney General['s] opinion, the DNR would have denied all . . . of these well applications [except for the Turzinski application] as impacting navigable waters." It therefore vacated the seven approved applications and remanded to the DNR the Turzinski application so that the DNR could consider the well's potential effect on the headwaters of a nearby creek.

¶7 The DNR and the business associations appealed, and, in early 2019, the court of appeals certified the appeal to this

court.[8]   After we accepted certification, two noteworthy procedural developments occurred.   First, we granted the legislature's motion to intervene, creating two sets of intervenors: the business associations and the legislature. Throughout this opinion, we refer to them collectively as the "Intervenors."   Second, the DNR now agrees with the circuit court and Clean Wisconsin that the DNR has the authority to review the environmental impact of a proposed well even if such a review is not required by Wis. Stat. § 281.34(4).

II

¶8   This certified appeal presents two questions:

(1)   Does Wis. Stat. § 227.10(2m) prohibit the DNR from considering the potential environmental effects of a proposed high capacity well when such consideration is not required by Wis. Stat. § 281.34(4)?

(2)   Does Wis. Stat. § 281.34(5m) bar Clean Wisconsin's claims?

¶9   The scope of the DNR's statutory authority is a question of law, which we review de novo.  See Papa v. DHS, 2020 WI 66, ¶19, 393 Wis. 2d 1, 946 N.W.2d 17.   When reviewing an agency's decision under Wis. Stat. ch. 227, we will generally

---

[8] The court of appeals also certified another consolidated "companion" case, Clean Wisconsin, Inc. v. DNR, No. 2016AP1688. Although both cases address the effect of Wis. Stat. § 227.10(2m) on the scope of the DNR's permit-approving authority, each deals with a different authorizing statute, thus presenting different legal questions.  See Clean Wis., Inc. v. DNR, No. 2016AP1688, slip op. (Wis. S. Ct. July 8, 2021).

uphold that decision unless we conclude that "the agency has erroneously interpreted a provision of law." Wis. Stat. § 227.57(2), (5). If an agency erroneously interpreted a provision of law and the correct interpretation of law does not "compel[] a particular action," we remand the cause to the agency "for further action" according to the correct statutory interpretation. § 227.57(5); see also Applegate-Bader Farm, LLC v. DOR, 2021 WI 26, ¶¶39, 41, 396 Wis. 2d 69, 955 N.W.2d 793.

¶10 Statutory interpretation is a question of law that we review de novo. Moreschi v. Village of Williams Bay, 2020 WI 95, ¶13, 395 Wis. 2d 55, 953 N.W.2d 318. When interpreting statutes, we start with the text, and if its meaning is plain on its face, we stop there. Myers v. DNR, 2019 WI 5, ¶18, 385 Wis. 2d 176, 922 N.W.2d 47. We also consider the statutory context, interpreting language consistent with how it is used in closely related statutes. Moreschi, 395 Wis. 2d 55, ¶¶13, 23. We afford no deference to the agency's interpretation of the statute in question. Wis. Stat. § 227.10(2g).

### III

¶11 Our analysis starts with a brief overview of the public trust doctrine and the statutes governing high capacity wells. We next review our Lake Beulah decision and whether Wis. Stat. § 227.10(2m) changes any of our conclusions there. We conclude with a discussion of whether Wis. Stat. § 281.34(5m) bars any of the claims here.

A

¶12 Any analysis of agency actions affecting the state's navigable waters "must start with the public trust doctrine." Hilton v. DNR, 2006 WI 84, ¶18, 293 Wis. 2d 1, 717 N.W.2d 166. This doctrine, enshrined in the Wisconsin Constitution, entrusts the State to protect Wisconsin's "navigable waters":

> The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor.

Wis. Const. art. IX, § 1; see also Movrich v. Lobermeier, 2018 WI 9, ¶26, 379 Wis. 2d 269, 905 N.W.2d 807 (noting that the doctrine's roots stretch back to the 1787 Northwest Ordinance). We have long interpreted this provision broadly and consistent with its sweeping scope, explaining that it protects more than strictly navigable waters or related commercial navigation rights. See, e.g., Diana Shooting Club v. Husting, 156 Wis. 261, 271, 145 N.W. 816 (1914); Muench v. PSC, 261 Wis. 492, 53 N.W.2d 514 (1952); Rock-Koshkonong Lake Dist. v. DNR, 2013 WI 74, ¶72, 250 Wis. 2d 45, 833 N.W.2d 800. For instance, we have held that the doctrine extends to "all areas within the ordinary high water mark of the body of water in question." Movrich, 379 Wis. 2d 269, ¶27. It protects not only the Great Lakes' beds but also "lesser inland waters," including "areas

10

covered with aquatic vegetation" within a particular high water mark. R.W. Docks & Slips v. State, 2001 WI 73, ¶19, 244 Wis. 2d 497, 628 N.W.2d 781. Similarly, we have held that the doctrine safeguards the public's use of the state's waters for even "purely recreational purposes." Id.; Nekoosa Edwards Paper Co. v. R.R. Comm'n, 201 Wis. 40, 47, 228 N.W. 144 (1930) (explaining that the public has a right to use certain state waters for "sailing, rowing, canoeing, bathing, fishing, hunting, skating, and other public purposes").[9]

¶13 The legislature, as one of the public's trustees, has delegated to the DNR some of its public trust responsibilities. Lake Beulah, 335 Wis. 2d 47, ¶34; see also Wis.'s Env't Decade, Inc. v. DNR, 85 Wis. 2d 518, 527, 271 N.W.2d 69 (1978). Broadly speaking, the legislature charged the DNR with the "general supervision and control over the waters of the state." Wis. Stat. § 281.12(1). To carry out that mission, the legislature granted the DNR the "necessary powers" to enhance the "quality management and protection of all waters of the state" against "all present and potential sources of water pollution." Wis. Stat. § 281.11. More specifically, the legislature has mandated

---

[9] The public-trust doctrine is not unlimited in scope. It does not apply to unnavigable wetlands that are part of no body of water's ordinary high water mark. Rock-Koshkonong Lake Dist. v. DNR, 2013 WI 74, ¶¶85-90, 110, 250 Wis. 2d 45, 833 N.W.2d 800 (noting, however, that the DNR may still regulate such areas if it has the statutory authority to do so). And we have explained that the public-trust jurisdiction does not extend to "non-navigable land." See id.

that the DNR "shall carry out the planning, management[,] and regulatory programs necessary for implementing the policy and purpose of this chapter," including "plans and programs for the prevention and abatement of water pollution and for the maintenance and improvement of water quality."  § 281.12(1). The legislature explained that this "comprehensive program under a single state agency" was "needed to protect human life and health" as well all uses of water throughout the state. § 281.11.  It also directs courts to "liberally construe[]" the water-protection statutes "in favor of the [statutes'] policy objectives" so as to ensure that the DNR serves the "vital purpose[]" of protecting the state's public-trust waters.  Id.

¶14  To that end, the DNR regulates the construction and operation of high capacity groundwater wells.  All high capacity wells must be approved by the DNR through a discretionary permit process.  Wis. Stat. §§ 281.34(2), 281.35.  The DNR is never obligated to give its approval.  Lake Beulah, 335 Wis. 2d 47, ¶41.  When it does approve an application, it is required to impose certain permit conditions, such as the condition that "all high capacity wells" comply with the groundwater-withdrawal requirements in § 281.35(4)-(6).  See § 281.34(5)(e).  And in certain circumstances, the DNR is required to deny a permit, such as when it is unable to ensure, via permit conditions, that a well will not "cause significant environmental impact" or that such impact is not "balanced by the public benefit of the well related to public health and safety."  See § 281.34(5)(a)-(d). Additionally, the DNR must conduct an environmental-impact

12

analysis before approving a permit for three categories of wells, a process detailed in its administrative rules. See § 281.34(4)(a); Wis. Admin. Code § NR 820.29-.32 (June 2020).

¶15 The parties agree that an environmental review is not required for any of the eight wells in this case. Because environmental review is legislatively required for some well applications but not for the ones at issue, the Intervenors allege that the DNR is implicitly prohibited from considering environmental-impact evidence in its permit-approval decision.

B

1

¶16 We addressed the same issue in Lake Beulah. As the Intervenors argue here, the Village of East Troy argued in Lake Beulah that the DNR had no authority to consider the environmental effects of a proposed high capacity well that fell outside the scope of Wis. Stat. § 281.34(4). See Lake Beulah, 335 Wis. 2d 47, ¶29. East Troy asserted that because the legislature required the DNR to conduct an environmental review in limited circumstances, it had implicitly precluded the DNR from conducting such reviews in all other circumstances. Id. And, according to East Troy, the "general policy provisions" of Wis. Stat. §§ 281.11 and 281.12 could not "supersede[]" that specific requirement. Id. East Troy argued that allowing the DNR to consider the environmental effects of all applications for high capacity wells, not just those required under § 281.34(4), would "create a permit system without standards" and cause confusion for permit applicants. See id., ¶¶29, 42.

¶17 We unanimously rejected those arguments, holding that the DNR has both a constitutional duty and the statutory authority to consider the environmental effects of all proposed high capacity wells. Id., ¶39. We held that the DNR's constitutional public-trust duty stems from the legislature delegating to the DNR that obligation via Wis. Stat. §§ 281.11 and 281.12. Id., ¶¶34, 39. And for the DNR to fulfill its duty under § 281.11 to "protect, maintain, and improve" the state's water supply, it had to consider the environmental effects of a proposed high capacity well. Id., ¶39 & n.29. Put another way, a permit application for a high capacity well triggers the DNR to act on its public-trust duty, under which it cannot ignore "concrete, scientific evidence of potential harm to waters of the state." Id., ¶¶39 n.28, 46.

¶18 We also explained that what the DNR's duty sometimes requires, its statutory authority likewise permits. "[T]here is nothing in either Wis. Stat. § 281.34 or § 281.35" that prevents the DNR from considering the environmental effects of proposed wells for which it is not required to do so. Id., ¶41. Rather, the legislature has "expressly granted" the DNR the "discretion to undertake the review [the DNR] deems necessary for all proposed high capacity wells." Id., ¶39. As for East Troy's argument that the DNR's broad discretion over permit approvals created a system "without standards," we explained that "broad standards [are] not . . . non-existent ones." Id., ¶43. Indeed, "[g]eneral standards are common in environmental statutes" because they allow the DNR to "utilize[] its

14

expertise" in determining how best to protect the environment within its statutory limits. Id., ¶43 & n.34. To ignore that expertise and prevent the DNR from considering evidence of potential environmental effects both "conflict[ed] with the permissive language in the statutes" and might have led to the "absurd result" where the DNR would be forced to approve a permit for a well that met other statutory requirements but that the DNR "knew . . . would cause harm to the waters of the state." Id., ¶¶28, 42. We therefore concluded that the DNR has "the authority and the general duty" to consider the environmental impact of proposed high capacity wells, especially when it is presented with evidence of potential environmental harms. Id., ¶¶64, 66.

¶19 We reaffirm our statutory analysis in Lake Beulah. Our unanimous decision there correctly interpreted the well-permitting statutes, each of which is the same today as it was in 2011. Accordingly, there is no need to re-interpret those statutes.

2

¶20 But Lake Beulah alone does not resolve this case because, after we heard oral arguments in that case, the legislature passed Act 21. See 2011 Wis. Act 21; Lake Beulah, 335 Wis. 2d 47, ¶39 n.30. The Act contained significant revisions to Wis. Stat. ch. 227, which governs administrative agencies and procedures, including adding subsec. (2m) to Wis. Stat. § 227.10:

> No agency may implement or enforce any standard, requirement, or threshold, including as a term or condition of any license issued by the agency, unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule that has been promulgated in accordance with this subchapter . . . .

The question is therefore what effect, if any, does § 227.10(2m) have on our analysis in Lake Beulah? The Intervenors argue that the DNR correctly determined, based on then-Attorney General Schimel's 2016 opinion, that § 227.10(2m) prohibits it from considering the environmental effects of a proposed high capacity well, except for when required under Wis. Stat. § 281.34(4).

¶21 We hold that Wis. Stat. § 227.10(2m) does not alter our analysis or conclusion in Lake Beulah. The DNR's authority to consider the environmental effects of proposed high capacity wells, while broad, is nevertheless explicitly permitted by statute.

¶22 The key to understanding § 227.10(2m) is to understand the meaning of the term "explicitly." There is no definition of "explicit" in the statutes, but it is a common word and the parties generally agree on its ordinary, dictionary definition. See Moreschi, 395 Wis. 2d 55, ¶21. "Explicit" is ordinarily defined as meaning "'clearly expressed' so as to 'leav[e] nothing implied.'" See, e.g., American Heritage Dictionary 645 (3d ed. 1994). The parties disagree about the relationship of "explicit" to "broad." The Intervenors read "explicit" as the

16

opposite not only of "implicit" but also of "broad" and "general,"[10] arguing that explicit authority must be specific. Clean Wisconsin counters that explicit authority can be broad or general, so long as the broad authority is clear.

¶23 Explicit authority and broad authority are different concepts but not mutually exclusive ones. An explicit phrase can be broad or specific; broad authority can be either explicit or implicit. See, e.g., Lake Beulah, 335 Wis. 2d 47, ¶39 ("the legislature has explicitly provided the DNR with the broad authority"); City of Columbus v. Ours Garage & Wrecker Serv., 536 U.S. 424, 433 (2002) (noting that a "general" provision "explicitly" preempted certain regulations); Explicit, American Heritage Dictionary 645 (3d ed. 1994) (providing the example phrase: "generalizations that are powerful, precise, and explicit"). The Intervenors err by treating "explicit" and "broad" as incapable of co-existing in a statute's authorizing language. In doing so, they misinterpret the scope of Wis. Stat. § 227.10(2m).

¶24 Section 227.10(2m) targets, in a general sense, only the distinction between explicit and implicit agency authority. It requires courts to strictly construe an agency's authorizing

---

[10] Implicit, American Heritage Dictionary 906 (3d ed. 1994) ("not directly expressed" or "not readily apparent"); Broad, id. at 241 ("covering a wide scope" or "general"); General, id. at 755 ("not limited in scope . . . or application"). Given the similarities in the definitions of "broad" and "general," and the fact that "general" is a synonym for "broad," we use those two terms interchangeably.

statute as granting the agency no implicit authority. Section 227.10(2m) does not, however, strip an agency of the legislatively granted explicit authority it already has. Nor does it negate a more targeted "directive from the legislature" to "liberally construe" the specific statutes that expressly confer an agency's authority. See Wis. Stat. § 281.11; Wis. Dep't of Justice v. DWD, 2015 WI 114, ¶30, 365 Wis. 2d 694, 875 N.W.2d 545 ("We take such a directive . . . seriously."). Accordingly, for purposes of § 227.10(2m), if the legislature clearly expresses in a statute's text that an agency can undertake certain actions, the breadth of the resulting authority will not defeat the legislature's clear expression. See also Clean Wis., Inc. v. DNR, No. 2016AP1688, slip op., ¶25 (Wis. S. Ct. July 8, 2021).

¶25 That is the case here: the legislature has granted the DNR the broad but explicit authority to consider the environmental effects of a proposed high capacity well. As we explained in Lake Beulah, the legislature clearly granted that authority by delegating to the DNR certain public-trust responsibilities in Wis. Stat. § 281.12. See Lake Beulah, 335 Wis. 2d 47, ¶¶34, 39. The text of § 281.12 explicitly requires the DNR to "carry out the planning, management[,] and regulatory programs necessary" to achieve the purpose of ch. 281. Just as explicitly, but even more specifically, the DNR "shall formulate plans and programs" to protect the state's waters. § 281.12(1). In considering the potential environmental impacts of proposed high capacity wells, the DNR is carrying out those express

18

directives. See Lake Beulah, 335 Wis. 2d 47, ¶¶39-44. That its explicit authority to do so is broad does not negate that authority.

¶26 Wisconsin Stat. §§ 281.34 and 281.35 are further explicit legislative permission for the DNR to exercise its broad authority under Wis. Stat. § 281.12. By the plain text of §§ 281.34(5)(e) and 281.35(5)(d), the DNR "shall" impose conditions on an approved well to ensure that, among other requirements, the well will neither "adversely affect[]" any "public water rights in navigable waters" nor "have a significant detrimental effect on the quantity or quality of the waters of the state." For some well applications, the DNR will be able to impose the necessary permit conditions based solely on its "expertise in water resources management." See Lake Beulah, 335 Wis. 2d 47, ¶¶42-43, 46. But for others, the DNR may need to collect and review evidence about a well's potential environmental effects before it knows what permit conditions will prevent those adverse effects. See id. In either case, the DNR is carrying out its explicit statutory directive to protect the state's waters via certain permit conditions. Therefore, the well-permitting statutes, in addition to Wis. Stat. §§ 281.11 and 281.12, explicitly allow the DNR to consider a proposed well's potential effect on the environment. See Wis. Stat. §§ 281.12, 281.34(5)(e); Lake Beulah, 335 Wis. 2d 47, ¶46.

¶27 Because the legislature explicitly granted the DNR broad authority to consider the potential environmental impact of proposed high capacity wells, we conclude that the enactment

19

of Wis. Stat. § 227.10(2m) does not change our holding in Lake Beulah.  The DNR's authority to consider the environmental effects of all high capacity wells is consistent with § 227.10(2m) and the DNR erred when it concluded otherwise.

3

¶28  The Intervenors' remaining arguments miss the mark and mirror the arguments we rejected in Lake Beulah.  Like East Troy in Lake Beulah, the Intervenors argue that a general statute cannot confer explicit authority.  As discussed above, however, and exemplified in Wis. Stat. § 281.12, general and explicit are not mutually exclusive concepts.

¶29  The Intervenors' claim that Wis. Stat. § 227.10(2m) "superseded" and "nullif[ied]" Lake Beulah falters for the same reason, but also because it rests on a misrepresentation of our holding in Lake Beulah.  The Intervenors misleadingly report that we "found" the DNR's broad public-trust duty "implicitly contained the more specific power" to consider the environmental effects of all proposed high capacity wells.  Nowhere in Lake Beulah did we describe the DNR's environmental-review authority as "implicit."  What we actually said was that "the legislature has expressly granted the DNR the authority and a general duty to review all permit applications and decide whether to issue the permit."  Lake Beulah, 335 Wis. 2d 47, ¶39 (emphasis added).  Thus, § 227.10(2m) does not supersede or nullify our holding in Lake Beulah.  See id., ¶39 n.31.

¶30  The Intervenors' resort to Wis. Stat. § 227.11(2)(a) does not save its argument.  That statute prevents courts from

20

finding implicit agency-rule-making authority in general policy or purpose statements that contain no explicit rule-making authorization. But this case is not about the DNR's rule-making power; section 227.11(2)(a) is therefore irrelevant.

C

¶31 Finally, regarding the second question in this certified appeal, we agree with the circuit court that Clean Wisconsin's claim is not barred by Wis. Stat. § 281.34(5m). That provision bars a challenge "based on the lack of consideration of the cumulative environmental impacts" of a proposed high capacity well. Id. (emphasis added). Clean Wisconsin's claims, however, are based on the fact that the DNR considered the potential environmental impact of these wells when deciding whether to grant the well permits. Accordingly, § 281.34(5m) is no bar to Clean Wisconsin's challenge.

III

¶32 The DNR erroneously interpreted a provision of law when it interpreted Wis. Stat. § 227.10(2m) as a bar to considering a proposed high capacity well's potentially adverse environmental effects for which an environmental review was not otherwise required. That error, however, does not compel the DNR to either approve or deny the permits. See Wis. Stat. § 227.57(5). Rather, after considering the environmental effects of these proposed wells, the DNR must use its discretion and expertise to determine whether to approve the wells. We therefore affirm the circuit court's vacating the DNR's approval of the wells, but, on remand to the circuit court, we modify the

21

circuit court's order with instructions that it remand all eight applications to the DNR. See id.; Applegate-Bader Farm, 396 Wis. 2d 69, ¶¶39, 41.

*By the Court.*—The judgment and order of the circuit court are modified and affirmed, and, as modified, the cause is remanded to the circuit court.

¶33  REBECCA GRASSL BRADLEY, J.    *(dissenting).*

> [F]reedom of men under government is, to have a standing rule to live by, common to every one of that society, <u>and made by the legislative power erected in it</u> . . . and not to be subject to the inconstant, uncertain, unknown, arbitrary will of another man[.]

John Locke, <u>Second Treatise of Civil Government</u> § 22 (John Gough ed., 1947) (emphasis added).  In a striking affront to the will of the people, a majority of this court defies the law enacted by the people's representatives in the legislature, warps the plain language of enabling statutes, and affords administrative agencies and unelected bureaucrats the power to override the legislature from which they derive their delegated authority. In doing so, the majority upends the foundational principle that "administrative agencies are the creatures of the legislature and <u>are responsible to it</u>."  <u>Schmidt v. Dep't of Res. Dev.</u>, 39 Wis. 2d 46, 57, 158 N.W.2d 306 (1968) (emphasis added).

¶34  Through Act 21,[1] the Wisconsin Legislature curtailed the exercise of regulatory power by abating the authority the legislature delegated to administrative agencies.  Specifically, the legislature mandated that "[n]o agency may implement or enforce any standard, requirement, or threshold, including as a term or condition of any license issued by the agency, unless . . . [it] is <u>explicitly</u> required or <u>explicitly</u> permitted by statute or by a rule[.]"  Wis. Stat. § 227.10(2m) (emphasis added).  Functionally, the legislature reclaimed a portion of its constitutionally-conferred powers previously delegated to

---

[1] 2011 Wis. Act 21.

1

agencies, an act embodying the indelible principle that "an agency's powers, duties and scope of authority are fixed and circumscribed <u>by the legislature</u> and <u>subject to legislative change</u>." <u>Schmidt</u>, 39 Wis. 2d at 56 (emphasis added).

¶35 Instead of giving effect to this legislative change, the majority nullifies it. Disregarding Wis. Stat. § 227.10(2m)'s instruction that agencies may exercise only those enforcement powers "explicitly" granted by the legislature or properly promulgated by rule, the majority infuses its statutory analysis with environmental policy concerns in order to reach the conclusion that the Department of Natural Resources (DNR) possesses the power to conduct environmental impact reviews for the eight high capacity wells at issue in this case. It doesn't.

¶36 To arrive at its favored holding, the majority severs Wis. Stat. § 227.10(2m) from any relationship with DNR's enabling authorities. Because DNR lacks any <u>explicit</u> authority to conduct environmental impact reviews for the eight high capacity wells, DNR may not undertake them. <u>Lake Beulah Mgmt. Dist. v. DNR</u>, 2011 WI 54, 335 Wis. 2d 47, 799 N.W.2d 73, does not (and cannot) supersede the law. The circuit court erred in vacating DNR's well approvals and the majority errs in affirming the judgment. I dissent.

I. STATUTORY AND FACTUAL BACKGROUND

A. Statutes Governing High Capacity Wells

¶37 Wisconsin Stat. ch. 281 governs DNR's review and approval of high capacity well applications. Under Wis. Stat.

2

§ 281.34(1)(b), "high capacity wells" have a pumping capacity of more than 100,000 gallons per day (gpd). Wells with a pumping capacity of less than 100,000/gpd are subject to a different set of requirements and are not at issue in this case. See Wis. Stat. § 281.34(3)(a) (requiring owners of a well that is "not a high capacity well" to simply notify the department before its construction and pay a $50 fee).

¶38 Wisconsin Stat. ch. 281 divides high capacity wells into two separate categories: wells with a "water loss" above 2,000,000/gpd in any 30-day period [hereinafter "large wells"], and wells with a "water loss" below 2,000,000/gpd [hereinafter "medium wells"].[2] See Wis. Stat. § 281.35(4)(b)1. Under Wis. Stat. § 281.34(1)(g), "water loss" means "a loss of water from the basin from which it is withdrawn as a result of interbasin diversion or consumptive use or both."

¶39 Wisconsin Stat. § 281.35(5)(d) sets forth express requirements DNR must follow before approving an application for a large well. Among other requirements, DNR "shall determine" "[t]hat no public water rights in navigable waters will be adversely affected [by the proposed large well]" and that "the proposed withdrawal will not have a significant detrimental effect on the quantity and quality of the waters of the state."

---

[2] Although the phrases "large wells" and "medium wells" do not appear in the Wisconsin Statutes, they are helpful labels for conceptualizing the statutory scheme under which DNR reviews and approves high capacity well applications. As will be explained later, although "large wells" and "mediums wells" are both "high capacity wells," only the former are subject to the heightened mandates of Wis. Stat. § 281.35.

3

§ 281.35(5)(d)1, 6.  If DNR approves a large well application, it "shall modify the applicant's existing approval or shall issue a new approval that specifies" a number of permitting conditions, including, among other things, "[t]he dates on which . . . water may be withdrawn," "[t]he uses for which water may be withdrawn," and "[a]ny other conditions, limitations and restrictions that the department determines are necessary to protect the environment[.]"  § 281.35(6)(a)3, 4, 7.

¶40  In contrast, medium wells are subject to considerably fewer permitting requirements than large wells; DNR is only sometimes allowed to conduct an environmental impact review before approving an application for a medium well.  Unlike large wells, DNR need not satisfy the requirements of Wis. Stat. § 281.35(5)(d) before approving a medium well application. Instead, medium wells primarily fall under the purview of Wis. Stat. § 281.34.  Pursuant to § 281.34(4)(a), DNR may conduct an environmental impact review only when a high capacity medium well falls into one of three categories:  (1) "[a] high capacity well that is located in a groundwater protection area";[3] (2) "[a]

_____

[3] Wisconsin Stat. § 281.34(1)(am) defines "groundwater protection area" as "an area within 1,200 feet of any of the following:

1. An outstanding resource water identified under s. 281.15 that is not a trout stream.

2. An exceptional resource water identified under s. 281.15 that is not a trout stream.

(continued)

4

high capacity well with a water loss of more than 95 percent of the amount of water withdrawn"; and (3) "[a] high capacity well that may have a significant environmental impact on a spring." § 281.34(4)(a)1-3.[4]

¶41 Under Wis. Stat. § 281.34(5), if a high capacity well corresponds to one of these three categories, DNR follows its environmental review process in accordance with its properly promulgated rules. Pursuant to this process, if DNR determines "that an environmental impact report . . . must be prepared for a proposed high capacity well" falling under one of the above three categories, DNR "may not approve the high capacity well" unless it includes permitting conditions "that ensure that the high capacity well does not cause significant environmental impact." See § 281.34(5)(b)-(d) (emphasis added). Importantly for purposes of this case, the Wisconsin Statutes do not expressly authorize or require DNR to conduct an environmental impact review for medium wells that do not fit at least one of these three categories.

B. DNR's Approval of Eight High Capacity Wells

¶42 All parties agree that the eight wells at issue in this case have a pumping capacity above 100,000/gpd and a water

---

3. A class I, class II, or class III trout stream, other than a class I, class II, or class III trout stream that is a farm drainage ditch with no prior stream history, as identified under sub. (8)(a)."

4 "Large wells" are also subject to the provisions of Wis. Stat. § 281.34(4)(a), in addition to the requirements set forth in Wis. Stat. § 281.35(5)(d).

5

loss below 2,000,000/gpd in any 30-day period. With these characteristics, they are all medium wells. Between March 2014 and April 2015, DNR received permit applications for the eight wells from parties uninvolved in this dispute. Ostensibly guided by this court's decision in Lake Beulah, DNR screened the applications for potential adverse impacts to waters of the state. In relevant part, Lake Beulah held that "DNR has the authority and a general duty to consider whether a proposed high capacity well may harm waters of the state." Lake Beulah, 335 Wis. 2d 47, ¶3.

¶43 For three of the applications at issue in this case, DNR delayed approval of the permits, citing concerns about neighboring waters; however, it never conducted a formal environmental review. For one of the applications, DNR initially recommended approval with a limited capacity for the well, but deferred its decision for further evaluation. For the remaining four applications, DNR conducted an analysis of the cumulative impacts these wells would have on surrounding waters and concluded that these four applications should be denied. However, instead of denying the applications, DNR offered the applicants the option to place them "on hold," noting that "the [Wisconsin] Legislature is currently discussing legislation that may affect the review of these applications." That new legislation was Act 21, which, as relevant to this case, created Wis. Stat. § 227.10(2m). DNR accurately anticipated that § 227.10(2m) would have an impact on the approval of well applications, among other agency actions. Under that statute,

6

agencies——including DNR——may not enforce "any standard, requirement, or threshold, including as a term or condition of any license," unless it is "explicitly required or explicitly permitted by statute or by a rule[.]" § 227.10(2m). In other words, the legislature prohibited DNR (and all other agencies) from acting beyond the authority explicitly delegated to it by the legislature. Because the legislature enacted § 227.10(2m) more than one month after this court heard oral argument in Lake Beulah and just six weeks before this court released its decision, the court did not apply the statute at all.

¶44 While all eight applications in this case were pending, the Wisconsin State Assembly requested a formal opinion from the Attorney General to resolve any confusion between Wis. Stat. § 227.10(2m) and Lake Beulah. The Attorney General concluded that § 227.10(2m) requires "an agency [to] have an explicit authority to impose license and permit conditions." 2016 Wis. Op. Att'y Gen. 1, ¶29 (2016) (OAG-01-16). According to the Attorney General, "[t]he timing of Act 21's passage, as well as the plain language of the decision, supports [the] conclusion that the Lake Beulah court did not interpret and apply Wis. Stat. § 227.10(2m)." Id., ¶9. Fundamentally, the Attorney General recognized that in enacting Act 21, the legislature "explicitly limited agency authority."[5] Id., ¶26.

---

[5] In May 2020, a new Attorney General withdrew OAG-01-16 in its entirety. See https://www.doj.state.wi.us/sites/default/files/news-media/5.1.20_High_Cap_wells_Letter.pdf.

7

¶45 In light of the Attorney General's formal opinion, DNR proceeded to review the eight well applications to determine whether environmental review of the medium wells was explicitly required or permitted by statute or rule. DNR answered this question in the negative, concluding that the eight wells did not fit any of the three categories listed under Wis. Stat. § 281.34(4)(a) and therefore did not trigger environmental review. DNR subsequently approved all eight well permits without conducting a formal environmental review.

¶46 Clean Wisconsin, Inc. and Pleasant Lake Management District (Petitioners) filed petitions for judicial review of DNR's approval of the well permits. The actions were consolidated in Dane County Circuit Court. The circuit court ruled in favor of Petitioners, vacating seven of DNR's approved permits and remanding for an evaluation of environmental impacts on the eighth approved permit.

¶47 DNR, as well as a group of intervening industry organizations,[6] appealed the decision of the circuit court. The court of appeals certified the case to this court. After we accepted certification, DNR reversed its position before the lower courts and aligned its arguments with those of Petitioners. The Joint Committee on Legislative Organization,

---

[6] Intervening industry organizations include Wisconsin Manufacturers & Commerce, Dairy Business Association, Midwest Food Processors Association, Wisconsin Potato & Vegetable Growers Association, Wisconsin Cheese Makers Association, Wisconsin Farm Bureau Federation, Wisconsin Paper Council, and Wisconsin Corn Growers Association.

8

on behalf of the Wisconsin Legislature, intervened. After a stay of proceedings, briefing proceeded on the merits and this court heard oral argument.

## II. DISCUSSION

¶48 Emphasizing the adverse environmental effects of approving these wells, the majority declines to apply the plain language of Wis. Stat. § 227.10(2m) and affirmatively rejects the legislature's limitations on agency authority——and not just DNR's. Contrary to the majority's conclusions, there is no legal authority for DNR to conduct environmental impact reviews of any of the eight proposed high capacity wells, much less any "explicit authority" as § 227.10(2m) commands. The public trust doctrine certainly doesn't confer it. Lake Beulah did not decide otherwise——the court never interpreted or applied § 227.10(2m) in that case. The majority conducts its analysis exactly backwards, purportedly seeking "explicit" agency authority first, finding only broad policy statements and general duties in the enabling statutes, and then torturing the language and meaning of § 227.10(2m) in order to achieve an absolute obstruction of that law. A proper analysis starts with § 227.10(2m).

### A. The "Explicit Authority" Requirement

¶49 When it enacted Wis. Stat. § 227.10(2m) more than a decade ago, the "legislature lamented that state agencies were somehow exercising regulatory authority far beyond what it intended to grant them." Kirsten Koschnick, Making "Explicit Authority" Explicit: Deciphering Wis. Act 21's Prescriptions

9

for Agency Rulemaking Authority, 2019 Wis. L. Rev. 993, 995 (2019). In response, the legislature——as the elected voice of the people of Wisconsin——"spoke up and clarified, through a piece of legislation, the ways in which it confers regulatory authority upon agencies." Id. at 996. Act 21 "dramatically alter[ed] the regulatory authority enjoyed by all state agencies." Id.

¶50 As part of Act 21, the legislature created Wis. Stat. § 227.10(2m), which imposes an "explicit authority" requirement upon agencies. In relevant part, the statute provides as follows:

> No agency may implement or enforce any standard, requirement, or threshold, including as a term or condition of any license issued by the agency, unless that standard, requirement, or threshold is explicitly required or explicitly permitted by statute or by a rule that has been promulgated in accordance with this subchapter, except as provided in s. 186.118(2)(c) and (3)(b)3.

§ 227.10(2m) (emphasis added). Contrary to the majority's vitiating reading of it, the statute speaks for itself: an agency may not enforce any standard, requirement, or threshold (including as a condition of a license) unless the agency is explicitly required or permitted to do so by statute or by properly promulgated rules.

¶51 "Explicit" means what any person would reasonably understand it to mean: something "[e]xpressed without ambiguity or vagueness" and "leaving no doubt." Explicit, Black's Law Dictionary 725 (11th ed. 2019); see also Explicit, Oxford English Dictionary 901 ("[d]istinctly expressing all that is

10

meant; leaving nothing merely implied or suggested; unambiguous; clear"); State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶53, 271 Wis. 2d 633, 681 N.W.2d 110 (instructing courts to turn to dictionary definitions to ascertain the plain meaning of a statute). "Required" and "permitted" likewise hold commonplace meanings. The former means to "to stipulate as obligatory by authority," particularly to comply with a "law [or] regulation." Require, The American Heritage Dictionary 1492 (5th ed. 2011); Require Oxford English Dictionary 2541 (6th ed. 2007). The latter means to "allow or give consent to a person or thing to do . . . something." Permit, The American Heritage Dictionary 2166 (5th ed. 2011); Permit Oxford English Dictionary 1315 (6th ed. 2007) ("to allow the doing of (something); consent to"). After Act 21, agency authority may no longer be derived by implication. As the plain language of § 227.10(2m) provides, if an enabling statute or lawfully promulgated rule does not unambiguously—and without any intimation of doubt—confer authority upon an agency to exercise a certain power (either to comply with the law or in accordance with the legislature's express consent), the agency simply does not possess that power; instead, the legislature retains it.

¶52 This interpretation of Wis. Stat. § 227.10(2m) conforms to our precedent. In Palm, we noted that the legislature "significantly altered our administrative law jurisprudence by imposing an 'explicit authority requirement' on our interpretations of agency powers." Wisconsin Legislature v. Palm, 2020 WI 42, ¶51, 391 Wis. 2d 497, 942 N.W.2d 900 (citation

11

omitted). In particular, we determined that the language of § 227.10(2m) "requires us to narrowly construe imprecise delegations of power to administrative agencies." Id., ¶52 (citation omitted). Agencies may not, for example, glean implied powers from general statutory language, nor can they transform broad statutory statements of legislative purpose or intent into a conferral of authority.[7] See id. The legislature's new statutory scheme "prevent[s] agencies from circumventing this new 'explicit authority' requirement by simply utilizing broad statutes describing the agency's general duties or legislative purpose as a blank check for regulatory authority." Id. (quoted source omitted).

¶53 Just last year in Papa v. DHS, this court applied the plain language of Wis. Stat. § 227.10(2m) in considering whether the Department of Health Services (DHS) had the authority to recoup payments made to Medicaid service providers. See Papa v. DHS, 2020 WI 66, ¶2, 393 Wis. 2d 1, 946 N.W.2d 17. Applying explicit language in DHS's enabling statutes and properly

---

[7] Even within the space of agency rulemaking, Act 21 forbids agencies from promulgating rules under merely implicit grants of authority. For example, agencies may not promulgate rules by relying upon statements of "legislative intent, purpose, findings, or policy," Wis. Stat. § 227.11(2)(a)1, nor can agencies rely upon "statutory provision[s] describing the agency's general powers or duties." § 227.11(2)(a)2. Neither do "statutory provision[s] containing a specific standard, requirement, or threshold" "confer rule-making authority . . . or augment [any agency's] rule-making authority beyond the rule-making authority that is explicitly conferred on the agency by the legislature." § 227.11(2)(a)3 (emphasis added).

12

promulgated rules, we concluded that DHS had the authority to recoup such payments only in three specific circumstances: when DHS cannot verify (1) the actual provision of covered services, (2) that the reimbursement claim is appropriate for the service provided, or (3) that the reimbursement claim is accurate for the service provided. Id., ¶40. Because DHS's recoupment policy exceeded the explicit grant of authority to DHS, it was unlawful. Id., ¶41. Significantly for this case, we determined that "absent any explicit authority" for DHS's recoupment policy, "we are left with a clear conclusion[:] [t]here is no legal basis for [that policy]." Id. Under the directives of § 227.10(2m), this court is supposed to "look to the statutes and promulgated [agency] rules to determine the scope of [the agency's] explicit . . . authority." Id., ¶32 (emphasis added). If these sources of law do not explicitly confer authority, the agency lacks any lawful power to take that specific agency action.

¶54 Elevating its environmental policy preferences over the legislature's prerogative to reclaim its constitutional authority, the majority distorts the plain language of Wis. Stat. § 227.10(2m) to achieve its own ends. In doing so, the majority flagrantly flouts foundational principles of constitutional governance. "We have long recognized that administrative agencies are creations of the legislature and that they can exercise only those powers granted by the legislature." Martinez v. DILHR, 165 Wis. 2d 687, 697, 478 N.W.2d 582 (1992) (citation omitted) (emphasis added). "[T]he

13

legislature may withdraw powers which have been granted, prescribe the procedure through which granted powers are to be exercised, and if necessary wipe out the agency entirely." Schmidt, 39 Wis. 2d at 57. Administrative agencies are not only "creatures of the legislature," but they "are responsible to it." Chicago & N.W. Ry. Co. v. Pub. Serv. Comm'n, 43 Wis. 2d 570, 579, 169 N.W.2d 65 (1969). When the legislature confines agency authority within the legislature's explicit consent, that is the law and the will of the people, which this court is duty-bound to respect and to uphold.

¶55 The majority frees administrative agencies from the legislature's "explicit authority" requirement in Wis. Stat. § 227.10(2m), to the detriment of the structural separation of powers embodied in our constitutional architecture. "The United States and Wisconsin Constitutions both vest exclusive powers in each of three independent branches of government, not four." Koschkee v. Taylor, 2019 WI 76, ¶47, 387 Wis. 2d 552, 929 N.W.2d 600 (Rebecca Grassl Bradley, J., concurring). An administrative state was "not the Framers' design." Peter J. Wallison, Judicial Fortitude: The Last Chance to Rein in the Administrative State ix (2018). Instead, the Framers "structured a tripartite system of separate powers in which each branch of the government had an assigned but limited role." Id. "The legislature makes, the executive executes, and the judiciary construes the law." Wayman v. Southard, 23 U.S. 1, 46 (1825). Neither our state nor federal constitutions empower anyone other than the legislature to make law——including any

14

administrative agency. <u>See</u> U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress[.]"); Wis. Const. art. IV, § 1 ("The legislative power shall be vested in a senate and assembly[.]"). "Through the Constitution, after all, the people had vested the power to prescribe rules limiting their liberties <u>in Congress alone</u>." <u>Gundy v. United States</u>, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting) (emphasis added). As James Madison declared, "[n]o political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty" than the separation of powers. The Federalist No. 47, at 301 (James Madison) (C. Rossiter ed., 1961). Preserving the legislature's prerogative to control its constitutionally-vested law-making powers safeguards the peoples' liberty.

¶56 Courts "have too long abrogated [their] duty to enforce the separation of powers required by our Constitution." <u>DOT v. Ass'n of Am. Railroads</u>, 575 U.S. 43, 91 (2015) (Thomas, J., concurring). The majority abrogates the court's duty in this case. While some may applaud the court's advancement of environmental goals, its decision "sanctions the growth of an administrative system that concentrates the power to make laws and the power to enforce them in the hands of a vast and unaccountable administrative apparatus that finds no comfortable home in our constitutional structure." <u>Id.</u> (Thomas, J., concurring). The majority makes administrative agencies superior to the legislature, which is irreconcilable with the republican system of governance established by the Framers. "In

15

republican government, the legislative authority necessarily predominates." Morrison v. Olson, 487 U.S. 654, 698 (1988) (Scalia, J., dissenting) (quoting The Federalist No. 51, at 322 (James Madison) (C. Rossiter ed. 1961)). "The people bestowed much power on the legislature, comprised of their representatives whom the people elect to make the laws." Gabler v. Crime Victims Rights Bd., 2017 WI 67, ¶60, 376 Wis. 2d 147, 897 N.W.2d 384 (emphasis added). The people never imparted any power on administrative bureaucrats insulated from any democratic oversight by the people. Through Act 21, the legislature reclaimed the power the people gave it and this court has no authority to override this legislative choice.

¶57 The majority's move has injurious impact far beyond a handful of wells. "Although the Framers could not have envisioned the modern administrative state, they certainly envisioned the danger to liberty posed by the accumulation of government powers in the hands of federal officials." Charles J. Cooper, Confronting the Administrative State, 25 Nat'l Aff. 96, 96 (Fall 2015). This concern exists no less at the state level. Although the legislature created our current administrative system, the majority transforms it into Frankenstein's monster, a behemoth beyond legislative control unless the legislature kills it. While the majority's decision in this case is an affront to the legislature, it is the people who will suffer in its aftermath. "The concentration of power within an administrative leviathan clashes with the constitutional allocation of power among the elected and

16

accountable branches of government at the expense of individual liberty." Koschkee, 387 Wis. 2d 552, ¶42 (Rebecca Grassl Bradley, J., concurring). When the judiciary rides roughshod over laws restricting the exercise of delegated legislative authority, it imperils "the liberty of all citizens." Operton v. LIRC, 2017 WI 46, ¶80, 375 Wis. 2d 1, 894 N.W.2d 426 (Rebecca Grassl Bradley, J., concurring). "The Framers 'believed the new federal government's most dangerous power was the power to enact laws restricting the people's liberty.'" Fabick v. Evers, 2021 WI 28, ¶56, 396 Wis. 2d 231, 956 N.W.2d 856 (Rebecca Grassl Bradley, J., concurring) (quoting Gundy, 139 S. Ct. at 2134 (Gorsuch, J., dissenting)). In this case, the majority affords administrative agencies carte blanche to regulate the people and entities they govern, based solely on broad grants of authority, denying the legislature the ability to check the actions of the bureaucracy it created.

¶58 Notwithstanding the absence of a constitutional basis for the administrative state, "many commentators assert that there is little alternative to the powerful administrative agencies we have today," in light of an increasingly "complex U.S. economy and society." Wallison, supra, at 19, 30. But "[g]overnmental efficiency can never be allowed to trump the people's liberty." Fabick, 396 Wis. 2d 231, ¶67 (Rebecca Grassl Bradley, J., concurring). "The end result" of the majority's view of agencies "may be trains that run on time (although I doubt it), but the cost is to our Constitution and the individual liberty it protects." Ass'n of Am. Railroads, 575

17

U.S. at 91 (Thomas, J., concurring). Instead of "straying further and further from the Constitution without so much as pausing," we should "stop to consider that document before blithely giving the force of law to any other agency." Michigan v. E.P.A., 576 U.S. 743, 763-64 (2015) (Thomas, J., concurring). The people of Wisconsin gave the legislature——not administrative agencies——the power to make law. Accordingly, if the legislature decides to curtail the delegated powers of agencies by enacting legislation limiting agency action to that which is explicitly required or permitted by the legislature, this court must uphold the law. The legislature neither requires nor permits DNR to conduct an environmental review of the eight wells at issue in this case and the majority's conclusion to the contrary undermines the rule of law.

B. DNR Lacks Explicit Authority to Conduct Environmental Impact Reviews for the Eight High Capacity Wells.

¶59 Nowhere in the Wisconsin Statutes or in any lawfully promulgated rules does DNR have the explicit authority to conduct an environmental impact review of the high capacity wells at issue in this case. All parties agree that the eight wells have a "water loss" below 2,000,000/gpd and a pumping capacity above 100,000/gpd, qualifying each as a medium well. None of them are large wells, so Wis. Stat. § 281.35(5)(d) does not apply. The only statutory authority authorizing DNR to conduct environmental reviews of medium wells lies in Wis. Stat. § 281.34(4)(a). Nothing in that statute expressly authorizes DNR to do so in this case.

18

¶60 To reiterate, Wis. Stat. § 281.34(4)(a) explicitly authorizes DNR to conduct environmental impact reviews only for three specific types of high capacity wells: (1) "[a] high capacity well that is located in a groundwater protection area"; (2) "[a] high capacity well with a water loss of more than 95 percent of the amount of water withdrawn"; and (3) "[a] high capacity well that may have a significant environmental impact on a spring." § 281.34(4)(a)1-3. The parties all agree that the eight wells in this case do not fit any of these three categories. This fact is fatal to Petitioners' claim. Section 281.34(4)(a) is the only statute requiring DNR to conduct an environmental impact review for high capacity medium wells, but only for three categories of wells to which the eight wells in this case do not belong: "[DNR] shall review an application for approval of any of the following [three categories] using the environmental review process[.]" (Emphasis added.) Even the majority acknowledges that "an environmental review is not required for any of the eight wells in this case." Majority op., ¶15. No statute permits environmental reviews of these wells either. Because the eight high capacity medium wells under consideration do not fall into any of the three statutory categories explicitly requiring DNR action, DNR has no authority to conduct environmental impact reviews of them.[8]

―――――――――――

[8] DNR——now arguing in support of Petitioners——contends that allowing DNR to conduct environmental impact reviews for high capacity medium wells only if they fall under Wis. Stat. § 281.34(4)(a)'s three categories would lead to absurd results. According to DNR, under the definition of "groundwater protection area" for example (see footnote 3, supra), DNR

(continued)

19

¶61 The majority gives short shrift to Wis. Stat. § 227.10(2m) and contrives "explicit" authority from broadly worded statements of policy and purpose rather than express requests or permissions from the legislature. In particular, the majority relies on Wis. Stat. §§ 281.11 and 281.12. These broadly-worded statutes leave everything to inference and implication. The former——nothing more than a "[s]tatement of policy and purpose"——states in part that DNR "shall . . . protect, maintain and improve the quality and management of the waters of the state[.]" § 281.11. The latter——a provision of "[g]eneral department powers and duties"——states in part that DNR "shall have the general supervision and control over the waters of the state" and "shall carry out the

possesses the authority to conduct an environmental impact review for proposed wells within 1,200 feet of high-quality waters but not wells just a few feet further——a result it deems absurd. But the legislature engages in this sort of line-drawing all the time and DNR's position abandons basic principles of statutory interpretation. It is the job of this court to "apply [a] statute as written, not interpret it as we think it should have been written." Columbus Park Hous. Corp. v. City of Kenosha, 2003 WI 143, ¶34, 267 Wis. 2d 59, 671 N.W.2d 633. "Policy decisions are left to the legislature." Milwaukee J. Sentinel v. City of Milwaukee, 2012 WI 65, ¶37, 341 N.W.2d 607, 815 N.W.2d 367. "[W]e are not permitted to second-guess the policy choice of the legislature" that it was "entitled to make." Kohn v. Darlington Cmty. Sch., 2005 WI 99, ¶43, 283 Wis. 2d 1, 698 N.W.2d 794. Under Wis. Stat. § 281.34(4)(a)1, the legislature mandates environmental impact reviews for high capacity wells located in a groundwater protection area, which the legislature defines as areas within 1,200 feet of high-quality waters. See § 281.34(1)(am). The legislature set the standard, which DNR may not override. There is nothing absurd about this provision or its application. The legislature established a threshold of 1,200 feet and that is the standard we must apply.

20

planning, management and regulatory programs necessary for implementing the policy and purpose of this chapter." § 281.12(1). Branding these nebulous grants of authority "explicit" empties the word of any meaning and impermissibly defeats the legislature's curtailment of agency power.

¶62 Wisconsin Stat. §§ 281.11 and 281.12 contain no explicit statement authorizing DNR to conduct environmental impact reviews; notably, the phrase "environmental impact review" (or anything remotely similar) does not appear in the statute at all. Section § 227.10(2m) flatly prohibits agencies from deriving authority from such sweeping statements of "policy and purpose" or "general duties." See § 227.10(2m) (stating that agencies can impose permitting conditions only as "explicitly required or explicitly permitted by statute or by a rule"). As we just construed it in Palm, Act 21 "prevent[s] agencies from circumventing this new 'explicit authority' requirement by simply utilizing broad statutes describing the agency's general duties or legislative purpose as a blank check for regulatory authority." Palm, 391 Wis. 2d 497, ¶52 (quoted source omitted). The majority's reliance on these descriptions of general duties, policies, and purpose is in error.

¶63 DNR's properly promulgated rules afford it no authority to conduct an environmental impact review for these eight wells either. DNR——now arguing in support of Petitioners——points to Wis. Admin. § NR 140.02(4) as a basis for such authority. Under that rule, DNR "may take any actions . . . if those actions are necessary to protect public health and welfare

21

or prevent significant damaging effect on groundwater or surface water quality[.]" § NR 140.02(4). Just like Wis. Stat. §§ 281.11 and 281.12, this provision makes no mention of environmental impact reviews, nor does its decidedly broad language contain any explicit authorization for such reviews. "Any actions necessary" cannot be reasonably construed as an "explicit" requirement or permission as Wis. Stat. § 227.10(2m) demands. DNR additionally cites Wis. Admin. § NR 150.20, but that provision does not explicitly require or allow environmental impact reviews for the wells at issue in this case. Under § NR 150.20(1m)(h), an environmental impact analysis is not a prerequisite for the approval of wells under Wis. Stat. § 281.34 "except for wells under [§] 281.34(4)." (Emphasis added.) Under DNR's own rules, approvals of high capacity wells outside of § 231.34(4)(a)'s three categories are merely "minor actions." See § NR 150.20(1m).

¶64 Attempting to buttress its flimsy statutory analysis, the majority disclaims any "need to re-interpret" Wis. Stat. §§ 281.11 or 281.12 and instead elects to "reaffirm our statutory analysis in Lake Beulah" despite its abrogation by the legislature's enactment of Wis. Stat. § 227.10(2m). Majority op., ¶19. In blatant defiance of duly enacted law, the majority refuses to allow § 227.10(2m) to take effect, instead illegitimately allowing the court's superseded decision to supplant the law. In relevant part, Lake Beulah held that "DNR has the authority and a general duty to consider potential environmental harm to the waters of the state when reviewing a

22

high capacity well permit application." Lake Beulah, 335 Wis. 2d 47, ¶44. The court further determined that "[t]he high capacity well permitting framework along with the DNR's authority and general duty to preserve waters of the state provides the DNR with the discretion to undertake the review it deems necessary for all proposed high capacity wells, including the authority and a general duty to consider the environmental impact of a proposed high capacity well on waters of the state." Id., ¶39. According to the Lake Beulah court, Wis. Stat. ch. 281——reflecting a "delegation of the State's public trust obligations"——endows DNR with this extraordinary authority. Id.

¶65 Setting aside its questionable constitutional validity,[9] Lake Beulah was superseded by the legislature's

---

[9] See Koschkee v. Taylor, 2019 WI 76, ¶48, 387 Wis. 2d 552, 929 N.W.2d 600 (Rebecca Grassl Bradley, J., concurring) ("Applying an originalist interpretation of the Constitution, some United States Supreme Court justices and several commentators have opined against the legislature relinquishing its vested legislative power 'or otherwise reallocat[ing] it,' echoing the historical understanding that '[t]he legislative c[ould not] transfer the power of making laws to any other hands: for it being but a delegated power from the people, they who have it [could not] pass it over to others.' DOT v. Ass'n of Am. Railroads, 575 U.S. 43, 73 (2015) (Thomas, J., concurring) (quoting John Locke, Second Treatise of Civil Government § 141, at 71 (J. Gough ed. 1947)) (emphasis added; alterations in original). See also Richard A. Epstein, Why the Modern Administrative State Is Inconsistent with the Rule of Law, 3 N.Y.U. J. of L. & Liberty 491, 496 (2008) (the argument 'that the Constitution authorizes the creation of independent agencies with aggregated powers of a legislative, executive, and judicial nature . . . fails so long as it depends on any form of originalism' and 'the text itself points to a system whereby the tripartite division is meant to be rigid in law'); Phillip Hamburger, Is Administrative Law Unlawful? 336 (2014) ('[T]he government can bind Americans only through laws, and only through courts with juries and judges, thus preserving the most

(continued)

23

rollback of regulatory discretion in Wis. Stat. § 227.10(2m), which abrogated that decision. As a preliminary matter, Lake Beulah never considered the impact of § 227.10(2m) on its analysis, although the majority pretends they coalesce. The legislature enacted this statute in 2011, more than one month after the Lake Beulah court heard oral argument and only six weeks before the court released its decision. In a footnote, the Lake Beulah court acknowledged that "[n]one of the parties argue[d] that the amendments to Wis. Stat. ch. 227 in [Act 21] affect the DNR's authority in this case." Id., ¶39 n.31. In supplemental briefing after oral argument, both DNR and Lake Beulah Management District discussed the impact of Act 21 on the case, but the court simply concluded that Act 21 "[did] not affect [its] analysis" and that it "does not address this statutory change any further." Id. Obviously, the Lake Beulah court declined to consider the impact of Act 21 in declaring DNR's broad agency powers. In this case, the court addresses Act 21's impact on DNR's powers for the first time.

¶66 Regardless of the timing between Act 21 and this court's decision in Lake Beulah, the court's pronouncements in that case are contrary to the legislature's curtailment of agency powers in Wis. Stat. § 227.10(2m), which abrogated that case. It is the duty of this court "to say what the law is" lest we "risk perpetuating erroneous declarations of the law." Operton, 375 Wis. 2d 1, ¶73 (Rebecca Grassl Bradley, J.,

---

basic conditions of freedom.').").

24

concurring). Instead of recognizing that the legislature now prohibits agencies from enforcing "any standard, requirement, or threshold" unless it is "explicitly required or explicitly permitted by statute or rule" the majority doubles down on <u>Lake Beulah</u>'s pre-§ 227.10(2m) analysis, which sanctions agency action so long as "[t]here is nothing in either Wis. Stat. §§ 281.34 or 281.35 that prevents the DNR from considering the environmental effects of proposed wells for which it is not required to do so." Majority op., ¶18 (quoted source omitted). This is the <u>exact opposite</u> of what § 227.10(2m) says. Instead of respecting the legislature's decision to confine agency action within the bounds of the legislature's explicit requirements and permissions, the majority restores the status quo ante Act 21. The majority rewrites the law to give agencies a free hand to act unless the legislature explicitly prohibits the specific agency action. Such judicial activism subverts the will of the people expressed in the laws enacted by their elected representatives.

¶67 The majority is quite transparent about its motives in rewriting the law, explaining that denying "DNR the discretion to undertake the review the DNR deems necessary" would preclude DNR from "utiliz[ing] its expertise in determining how best to protect the environment[.]" Majority op., ¶18 (quoted sources omitted). In this stunning admission, the majority reveals the policy preferences motivating its decision to allow anointed "experts" to reign over the people as bureaucratic overlords, unconstrained by the democratic safeguards the majority

25

immobilizes in this decision. The majority's decision is "antithetical to the Founders' vision of our constitutional Republic, in which supreme power is held by the people through their elected representatives." Koschkee, 387 Wis. 2d 552, ¶45 (Rebecca Grassl Bradley, J., concurring).

¶68 Preserving Lake Beulah as an accurate declaration of law despite superseding legislative action overthrows the legislature as the "supreme lawmaking body" of this state. City of Milwaukee v. State, 193 Wis. 423, 448, 214 N.W. 820 (1927). As we recognized nearly a century ago:

> Where the Legislature has enacted statutes within the proper field of legislation, and not violative of the provisions of the federal and state Constitutions, its edicts are supreme, and they cannot be interfered with by the courts; and, where legal principles have been laid down by the courts in the proper exercise of their judicial functions, and have continued in force for such a period as to create vested rights, such principles are clothed with a force possessed by a statutory enactment, and should be recognized and applied until the lawmaking body sees fit either to abrogate or modify them.

Id. at 428 (emphasis added). No one contends Wis. Stat. § 227.10(2m) violates our state or federal constitutions. If anything, the statute represents at least a partial restoration of the constitutional order. Section 227.10(2m) has the force of law but the majority violates the constitutional separation of powers by making this court a super-legislature, effectively vetoing law because it interferes with the majority's environmental policy preferences. The legislature's mandate in § 227.10(2m) precludes DNR from conducting an environmental impact review on a proposed well unless it is "explicitly

26

required or explicitly permitted by statute or by a rule[;]" a mere "general duty" or only implied "discretion" fall short of an explicit authorization.

¶69 The majority seems to suggest the public trust doctrine provides independent authority for DNR to conduct environmental impact reviews of the wells in this case, although it also recognizes that "DNR's constitutional public-trust duty stems from the legislature delegating to the DNR that obligation via Wis. Stat. §§ 281.11 and 281.12." Majority op., ¶17. Because the constitution does not mention DNR anywhere, the only mechanism by which the legislature could delegate its public trust duty to DNR would be statutory. Because neither § 281.11 nor § 281.12 explicitly require or permit DNR to exercise the legislature's public trust duties, § 227.10(2m) precludes DNR from exercising them regardless of how §§ 281.11 and 281.12 were interpreted in the past.

¶70 The public trust doctrine developed from language in Article IX, Section 1 of the Wisconsin Constitution, which provides in relevant part:

> The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor.

Wis. Const. art. IX, § 1. Interpreting this language, this court has held that "[t]he legislature has the primary authority

27

to administer the public trust for the protection of the public's rights, and to effectuate the purposes of the trust." Hilton ex rel. Pages Homeowners' Ass'n v. DNR, 2006 WI 84, ¶19, 293 Wis. 2d 1, 717 N.W.2d 166 (emphasis added); see also State v. Bleck, 114 Wis. 2d 454, 465, 338 N.W.2d 492 (1983) ("The primary authority to administer this trust for the protection of the public's rights rests with the legislature, which has the power of regulation to effectuate the purposes of the trust."). Accordingly, DNR possesses authority under the public trust doctrine only to the extent "the legislature has delegated to DNR the duty of enforcing the state's environmental laws." Hilton, 293 Wis. 2d 1, ¶20. DNR does not hold any constitutional authority; rather, its powers exist only insofar as the legislature grants them to DNR.

¶71 By enacting Wis. Stat. § 227.10(2m), the legislature limited its delegation of powers to DNR, which may conduct an environmental impact review only if the legislature explicitly requires or permits one. As explained, the legislature has not done so, and the public trust doctrine confers no such authority on DNR. As the Attorney General recognized, Act 21 "revert[ed]" the public trust duties the legislature previously delegated to DNR "back to the Legislature, which is responsible for making rules and statutes necessary to protect the waters of the state. The Legislature is free to grant the authority to DNR to impose any conditions the Legislature finds necessary. However, the DNR has only the level of public trust duty assigned to it by

28

the Legislature, and no more." 2016 Wis. Op. Att'y Gen. 1, ¶53 (2016) (OAG-01-16).

¶72 A faithful reading of Wis. Stat. § 227.10(2m) leads to the inescapable conclusion that the legislature abrogated Lake Beulah and curtailed the broad grants of authority previously delegated to agencies——including DNR. DNR has no explicit authority to conduct an environmental impact review for any of the eight high capacity wells at issue in this case because the legislature has not explicitly required or permitted such reviews. No statute or lawfully promulgated rule provides DNR with any explicit authority to take this regulatory action. The circuit court erred in vacating DNR's well approvals in order to accommodate such reviews and the majority errs in upholding the circuit court's mistake.

* * *

¶73 The people of Wisconsin constitutionally conferred limited powers of governance across three (not four) branches of government. Extending beyond the parties to this case, the majority's decision undermines the sovereignty of the people and disturbs the equilibrium of governmental power to the detriment of the governed:

> Frequently an issue comes before this court clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis. But this wolf comes as a wolf.

Morrison, 487 U.S. at 699 (Scalia, J., dissenting). The majority patently disregards the law, impermissibly shifting

29

power from Wisconsin's citizens to unelected bureaucrats. The people never gave this court any authority to recalibrate the constitutional powers of the legislature vis-a-vis the executive. While doing so may accomplish the environmental protection agenda of the majority, its decision to ignore duly enacted law wounds our democracy and renders the legislature impotent to reclaim authority it imprudently delegated to the administrative state.[10] The majority's decision stands athwart the liberty-preserving principle that the legislature may modify or altogether terminate its delegation of power to administrative agencies, as subordinate creatures of the legislature.

¶74 "Administrative agencies are created by the legislature. The legislature has the ability to withdraw an agency's power, dictate how any agency is exercised, and extinguish the agency's power entirely." Palm, 391 Wis. 2d 497, ¶189 (Kelly, J., concurring) (citing Wis. Stat. § 15.02 and Schmidt, 39 Wis. 2d at 57). Through Act 21, the legislature both withdrew a portion of agency power and dictated how that power is to be exercised, but the majority overrides those

---

[10] See Koschkee, 387 Wis. 2d 552, ¶45 (Rebecca Grassl Bradley, J., concurring) ("Transferring to administrative agencies the core legislative duty of making laws abnegates powers the people gave their elected representatives. The consolidation of power within executive branch agencies 'often leaves Americans at the[ir] mercy' endowing agencies with 'a nearly freestanding coercive power' and '[t]he agencies thereby become rulers of a sort unfamiliar in a republic, and the people must jump at their commands.' Phillip Hamburger, Is Administrative Law Unlawful? 335 (2014).").

30

exclusively legislative choices. "It is not too much to say that we risk losing our democracy unless we can gain control of the agencies of the administrative state." Wallison, supra, at ix. Defying the law of this state, the majority nullifies the legislature's chosen mechanism for taking back some control, leaving the legislature with no apparent alternative but to repeal the statutes by which it has delegated its constitutional authority to make law, thereby extinguishing agency power altogether. Whether a majority of this court would respect that legislative act, or instead trigger a constitutional crisis, must await the legislature's response to this calamitous decision. I dissent.

¶75 I am authorized to state that Justice PATIENCE DRAKE ROGGENSACK joins this dissent.