**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**August 22, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2346**

Cir. Ct. No. **2022CV12**

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT IV**

---

STATE OF WISCONSIN EX REL. LARRY J. BROWN,

    PLAINTIFF-APPELLANT,

V.

SRSTC DIRECTOR ANN MORAN, IRIS BUCHANIEC
AND JESSICA SCULLY,

    DEFENDANTS-RESPONDENTS.

---

APPEAL from an order of the circuit court for Juneau County: PAUL S. CURRAN, Judge. *Reversed and cause remanded with directions.*

Before Kloppenburg, P.J., Graham, and Nashold, JJ.

¶1 KLOPPENBURG, P.J. Larry Brown petitioned for certiorari review of two Sand Ridge Secure Treatment Center (Sand Ridge) decisions

imposing sanctions against him for having violated disciplinary rules on two separate occasions.[1]  The circuit court dismissed his petition.

¶2      On appeal, Brown argues that Sand Ridge failed to provide notice of, and an opportunity to refute, the accusations against him, contrary to WIS. ADMIN. CODE § DHS 94.24(2)(g) and (h) and in violation of Brown's constitutional due process rights.[2]  We conclude that the record does not establish that Sand Ridge provided Brown with an opportunity sufficient to allow him to present a non-perfunctory response to the accusations against him before initiation of disciplinary action.  For this reason, we conclude that Sand Ridge proceeded contrary to WIS. ADMIN. CODE § DHS 94.24(2)(g).  In light of this conclusion, we need not and do not address WIS. ADMIN. CODE § DHS 94.24(2)(h) or the merits of Brown's constitutional due process arguments.  *See* ***Barrows v. American Fam. Ins. Co.***, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An

---

[1]  Brown named as defendants the Sand Ridge Director, Ann Moran, and two employees, Iris Buchaniec and Jessica Scully.  We refer to the defendants collectively as Sand Ridge.

At all relevant times, Brown was committed to Sand Ridge under WIS. STAT. ch. 980 (2021-22).  As our supreme court has explained:

> Chapter 980 provides for the involuntary commitment of certain individuals who are found to be sexually violent persons.  Section 980.01(7) defines a "sexually violent person" in part as "a person who has been convicted of a sexually violent offense … and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence."

***State v. Carpenter***, 197 Wis. 2d 252, 259, 541 N.W.2d 105 (1995).

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] All references to the Wisconsin Administrative Code are to the December 2010 register.

2

appellate court need not address every issue raised by the parties when one issue is dispositive."); ***Labor & Farm Party v. Elections Bd.***, 117 Wis. 2d 351, 354, 344 N.W.2d 177 (1984) ("This court does not normally decide constitutional questions if the case can be resolved on other grounds.").[3]  Accordingly, we reverse and remand to the circuit court with directions to grant the petition and reverse the two decisions at issue.

## BACKGROUND

¶3      To provide some context for our analysis, we summarize the disciplinary process as best we can discern it from the Sand Ridge Policy and Procedure included in the administrative record.  A patient's violation of one or more of the 44 Sand Ridge rules may lead to a counsel, a warning, or summary or formal sanctions.  A "counsel" allows Sand Ridge staff to warn the patient that the patient is noncompliant with a certain policy or procedure and to guide the patient to "identify appropriate alternatives [and] evaluate the benefits of those alternatives" without imposing disciplinary sanctions.      "Sanctions are

---

[3] Brown also argues that Sand Ridge violated its Policy and Procedure in the following respects:  the evidence does not show that it is more likely than not Brown violated the rules; Sand Ridge did not accept Brown's affidavits; Sand Ridge did not make its decisions based on the best available evidence; and Sand Ridge did not provide notice of the rules Brown was accused of violating and the possibility of receiving sanctions for the violations.  We do not reach these arguments because our conclusion that Sand Ridge failed to comply with WIS. ADMIN. CODE § DHS 94.24(2)(g) is dispositive.  *See **Barrows v. American Fam. Ins. Co.***, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

Brown further asserts that the circuit court erred by not sufficiently addressing Brown's arguments.  Because we address Brown's arguments and review them independently of the circuit court, we do not further consider Brown's assertions of circuit court error.  *See **State ex rel. Ortiz v. Carr***, 2022 WI App 16, ¶18, 401 Wis. 2d 450, 973 N.W.2d 786 ("'On certiorari we review the agency decision, not the decision of the circuit court.'") (quoting ***State ex rel. Markovic v. Litscher***, 2018 WI App 44, ¶9, 383 Wis. 2d 576, 916 N.W.2d 202).

consequences that result from major or minor rule/policy violations and may include a combined restriction of privileges and/or denial or limitation of patient rights." When a staff member believes that a patient's violation of a rule warrants a sanction, the staff member completes a form titled Behavior Disposition Record (BDR), in which the staff member describes the incident, and which is signed by the staff member and a supervisor.

¶4    The BDR then proceeds on two tracks. On one track, the Psychiatric Review Committee determines within 24 hours whether immediate intervention is necessary to address a significant mental health issue. On the other track, the staff member, with the approval of a supervisor, may offer the patient a Summary Sanction. If the patient does not accept the Summary Sanction, or if staff determine that a Summary Sanction is not appropriate, staff proceed with a Formal Sanction. Staff must then inform the patient of the rule violation, complete the BDR, and submit the BDR to the unit manager, who will appoint a panel (also referred to as a "committee") comprised of three staff members to hear the BDR.[4]

¶5    The hearing must take place within three working days of the BDR's submission to the unit manager. At the hearing, the committee allows the patient to respond to the violation, tells the patient the committee's conclusion regarding

---

[4] Sand Ridge Policy and Procedure appears to provide that staff write the BDR at 2 points in the process. As stated above, staff complete a BDR when staff believe that a patient's violation warrants a sanction, and the BDR then goes to the Psychiatric Review Committee for review and, if that Committee takes no action, staff proceed with a Summary Sanction and/or Formal Sanction. The policy also appears to contemplate that staff may complete a BDR when staff determine that a Formal Sanction is warranted and staff will then submit the BDR to the unit manager. It is not clear why the policy would require BDRs to be completed at two different times for the same incident. Regardless, what is important for our analysis is that, once the BDR is written, a hearing on the BDR is held within three days after the BDR has been submitted to the unit manager.

the violation (i.e., whether to impose sanctions and what sanctions to impose), and gives the patient a copy of the BDR.

¶6     We now turn to the two decisions that Brown challenges, which are contained in BDRs numbered 22595 and 22597.

*Behavior Disposition Record No. 22595*

¶7     Psychiatric care technician Iris Buchaniec completed BDR No. 22595 and described in that BDR the following incident. On November 10, 2021, Sand Ridge initiated a "formal count," which is a routine measure conducted at specific times each day and which requires each patient to report to an assigned location in order to verify the patient's physical presence at the facility. Fifteen minutes after formal count was called, Buchaniec found Brown in the day room, rather than in his bedroom where he was required to report for formal count. Buchaniec told Brown that he would receive a "counsel" for being in an unassigned area during formal count.

¶8     Buchaniec's account of the incident continued as follows:

> Patient Larry Brown then had started to yell and accuse[d] me of lying. Patient Larry Brown had stated "You better not write me up or I will make sure you will be in a lot of trouble. This is bullshit, you['re] lying. I was standing at my door." I had told patient Larry Brown that he was still in the day room when count was called and had arrived to his destination late. Patient Larry Brown started to get loud, argumentative and disrupt[ed] the day room. Patient Larry Brown had stated "You [want to] fight? We will fight, I will take legal actions against you and write everything up about you."

¶9     BDR No. 22595 charged Brown with "Disruptive Behavior" and "Failure to Take Direction." A hearing was held two days later before a three-person committee, which documented the hearing in a report titled "Behavior

5

Disposition Record Hearing Information." The report related what transpired at the hearing as follows:

> The BDR was read to patient Brown and he was asked to comment. The patient had a prepared statement to read but also commented. Patient Brown said he was in his room when staff came around to check on him for formal count. The patient stated that when formal count was announced he was going up the stairs because he had been talking to staff. Finally patient Brown said that he did not make any of the statements alleged in the BDR and that staff are lying on him.

¶10 The committee reported that it "finds the BDR more likely than not accurate as written." As a consequence, Brown, who had previously been classified as a Level C patient under the Sand Ridge patient classification system, was demoted to a Level B patient for 28 days. Level demotion generally increases the degree of patient supervision, imposes earlier curfews, and limits patient access to privileges.

¶11 Brown appealed to the Sand Ridge Director, who affirmed the BDR decision.

*Behavior Disposition Record No. 22597*

¶12 Buchaniec completed BDR No. 22597 and described in that BDR the following incident. At some time before 4:15 p.m. on November 13, 2021, Brown approached Buchaniec while she was completing her "census rounds."[5] During their conversation, Buchaniec reminded Brown that patients may only leave their rooms after curfew to use the restroom or receive medication. Brown

---

[5] A "Census Check" is made "at times other than formal counts to ensure all patients are accounted for and safe."

responded by saying, "[G]o ahead write me a BDR!  Write that BDR!"  Buchaniec continued her rounds after this encounter.

¶13     At around 4:15 p.m., Brown approached Buchaniec at her staff desk to have a conversation, and Buchaniec reminded Brown that his curfew was earlier due to his previous level demotion.  Buchaniec's account of the incident continued as follows:

> This conversation had escalated quickly.  Patient Larry Brown was argumentative and being disruptive, questioning me about his curfew. Patient Larry Brown was getting very loud and disruptive, stating "I spoke to [another patient] at 5 this morning, you were talking about me.["]  I had stated "This conversation is over, [p]lease leave the desk."  Patient Larry Brown stated "[Y]ou have a problem with me using the bathroom."  I had stated "[T]his conversation is over.  Please leave the desk."  Patient Larry Brown had stated "[O]h, [you're going to] be like that, all professional now."  I stated "[T]his conversation is now over, [l]eave the desk now!"  Patient Larry Brown had stated something as I was picking up the phone to call for an officer from [security], Patient Larry Brown then had started to walk away.

¶14     The BDR charged Brown with "Failure to Take Direction" and "Disruptive Behavior."  A hearing was held four days later before a three-person committee, which documented the hearing in a report titled "Behavior Disposition Record Hearing Information."  The report related what transpired at the hearing as follows:

> Patient Brown was informed that a BDR hearing was about to take place.  The patient went to his room and got a prepared statement but also brought down an affidavit from a peer.  The patient declined to specifically talk about the BDR and left the room after it was read.  The patient was brought back into the [room] and informed of the committee[']s decision.

¶15   The committee reported that it "finds the BDR more likely than not accurate as written."   As a consequence, Brown was demoted to Level A for five days.   Brown appealed to the Sand Ridge Director, who affirmed the BDR decision.

*Petition for Certiorari Review*

¶16   Brown filed a petition requesting certiorari review of both BDR decisions with the Juneau County circuit court in January 2022.   The court held a hearing on Brown's petition in December 2023 and subsequently entered an order affirming the decisions and dismissing the petition.

¶17   Brown appeals.

**DISCUSSION**

¶18   "'On certiorari we review the agency decision, not the decision of the circuit court.'"   ***State ex rel. Ortiz v. Carr***, 2022 WI App 16, ¶18, 401 Wis. 2d 450, 973 N.W.2d 786 (quoting ***State ex rel. Markovic v. Litscher***, 2018 WI App 44, ¶9, 383 Wis. 2d 576, 916 N.W.2d 202).   Our review is limited to the following four inquiries:  (1) whether the agency acted within the bounds of its jurisdiction; (2) whether it acted according to law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will, not its judgment; and (4) whether the evidence was sufficient that it might reasonably make the determination that it did.   ***Carr***, 401 Wis. 2d 450, ¶18 (citing ***State ex rel. Greer v. Wiedenhoeft***, 2014 WI 19, ¶35, 353 Wis. 2d 307, 845 N.W.2d 373).

¶19   The interpretation and application of administrative regulations are questions of law that we review de novo.   ***Piper v. Jones Dairy Farm***, 2020 WI 28, ¶13, 390 Wis. 2d 762, 940 N.W.2d 701.   We interpret administrative

regulations using the rules of statutory interpretation. *Id.* "When interpreting statutes, we start with the text, and if its meaning is plain on its face, we stop there." *Clean Wis., Inc. v. DNR*, 2021 WI 72, ¶10, 398 Wis. 2d 433, 961 N.W.2d 611.

¶20 Brown appeals as a pro se litigant. We construe pro se briefs "to make the most intelligible argument we can discern." *State ex rel. Wren v. Richardson*, 2019 WI 110, ¶25, 389 Wis. 2d 516, 936 N.W.2d 587.

¶21 As stated, Brown argues that Sand Ridge failed to comply with WIS. ADMIN. CODE § DHS 94.24(2)(g). Section DHS 94.24(2)(g) states: "Each patient shall be given an opportunity to refute any accusations prior to initiation of disciplinary action." To interpret this regulation, we must determine: first, what this opportunity requires, and second, when disciplinary action is initiated. "Opportunity" is not defined in § DHS 94, nor has it been defined by prior case law, and so "we look ... to recognized dictionary definitions to determine the common and ordinary meaning of [the] word." *Garcia v. Mazda Motor of America, Inc.*, 2004 WI 93, ¶14, 273 Wis. 2d 612, 682 N.W.2d 365. Representative definitions of "opportunity" include: "[a] favorable or advantageous circumstance or combination of circumstances," *Opportunity*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, https://www.ahdictionary.com/word/search.html?q=opportunity (last visited Aug. 19, 2024); and "an appropriate or favorable time or occasion," *Opportunity*, DICTIONARY.COM, https://www.dictionary.com/browse/opportunity (last visited Aug. 19, 2024). Applying these definitions, we interpret § DHS 94.24(2)(g) as entitling a patient to an appropriate occasion or set of circumstances that allows the patient to make a non-perfunctory response to the accusations against the patient.

¶22 From this interpretation, we conclude that for the occasion or set of circumstances to allow the patient to make a non-perfunctory response to the accusations, the patient must be informed of the accusations at some time before the hearing at which the patient is called on to present the refutation. If the "opportunity" to refute the accusations was limited only to the calling of the patient at the hearing without any pre-hearing notification to the patient of the accusations, the patient would be unprepared to respond to the accusations, the opportunity would be hollow, and the occasion or set of circumstances would not meet the "appropriate" part of the definition. In other words, a patient is not given an appropriate occasion or set of circumstances to refute an accusation at a disciplinary hearing when the patient is not informed of the substance of the accusation until after the hearing has commenced.

¶23 This interpretation is consistent with the only reasonable interpretation of the "prior to initiation of disciplinary action" part of the rule. *See* WIS. ADMIN. CODE § DHS 94.24(2)(g). Disciplinary action could be interpreted to be "initiated" at the moment the staff member completes the BDR, beginning the process that may lead to sanctions, but it would make no sense for the patient to be called on to refute the accusations before the BDR is written. Disciplinary action could also be interpreted to be "initiated" when punishment is imposed, following a finding of a rule violation. We conclude that this is the only reasonable interpretation. Therefore, a patient is required to have an opportunity to refute accusations against the patient before the imposition of sanctions or discipline. Our interpretation of "opportunity" as meaning that the patient is informed of the accusations sufficiently in advance of the hearing to allow the patient to present a non-perfunctory response is, therefore, consistent with the interpretation of "prior

to initiation of disciplinary action" as meaning before discipline is imposed at the hearing.

¶24 We now apply this interpretation to the undisputed facts. In BDR No. 22595, it is noted that "Patient state[s] [he] is not tak[ing] any summary." However, there is no indication in the record that Brown knew for what violation the summary sanction was being offered, or when he was offered the summary sanction. In the BDR Hearing Information, it is noted that "The BDR was read to patient Brown and he was asked to comment." However, there is no indication in the record that Brown was informed before the hearing of the accusations against him. Brown's comments at the hearing reflect the hollowness of the opportunity to comment at the hearing without his having been informed of the accusations ahead of the hearing. Brown focused on whether he had been in his room for the formal count, but he was not accused of violating any rule related to the formal count; rather he was accused of "Disruptive Behavior" and "Failure to Take Direction" related to his interaction with staff.

¶25 In BDR No. 22597, there is no notation that Brown was offered a summary sanction. It is noted that he "was informed that a BDR hearing was about to take place," but there is no indication in the record that Brown knew at that time the accusations that were stated in the BDR. Sand Ridge's briefing reflects the hollowness of the opportunity to comment at the hearing without Brown's having been informed of the accusations ahead of the hearing. Sand Ridge focuses on whether Brown had violated curfew, but the rule violation for which discipline was imposed did not relate to curfew; rather he was disciplined for "Disruptive Behavior" and "Failure to Take Direction" related to his interaction with staff.

¶26    In sum, the record does not show that Brown was informed of the accusations against him in any manner between the time that the BDRs were completed and the respective hearings commenced.  Rather, it appears that Brown was first informed of the accusations for which discipline was sought when the committee read him the BDR at each hearing.  Accordingly, we conclude that Sand Ridge proceeded on an incorrect theory of law when, for each BDR, it denied Brown the opportunity to refute the accusations against him, as required by WIS. ADMIN. CODE § DHS 94.24(2)(g).

¶27    Sand Ridge does not meaningfully dispute our interpretation of WIS. ADMIN. CODE § DHS 94.24(2)(g), as stated above.[6]  Rather, Sand Ridge argues that the record shows that Brown did have an opportunity to refute the accusations against him.  We address and reject Sand Ridge's specific arguments on this point in turn.

¶28    Sand Ridge argues that it is sufficient that the BDR was read to Brown at each hearing and that Brown came to each hearing with a prepared statement.  However, Sand Ridge does not explain how these facts show that Brown knew in advance of each hearing the accusations that he should address in his prepared statements.  Sand Ridge asserts that the BDR documents "describe staff telling Brown, contemporaneous with the violations themselves, what rules

---

[6] Sand Ridge asserts that there is no basis for interpreting WIS. ADMIN. CODE § DHS 94.24(2)(g) to require that a patient be provided with a copy of the BDR before the hearing.  That assertion does not conflict with our interpretation of the administrative regulation.  We agree that the regulation does not specify the mechanism by which a patient must be provided with an opportunity to refute the accusations against the patient.  Rather, we conclude only that the regulation requires that the patient be informed of the accusations sufficiently in advance of the hearing to allow the patient to present a non-perfunctory response to the accusations at the hearing.  As we explain in the text, the record does not show that Brown was provided with that opportunity here.

he was breaking." However, we do not see in the documents any indication that staff informed Brown, contemporaneous with the violations, either that he was being accused of "Disruptive Behavior" and "Failure to Take Direction," or what he did to establish those violations.

¶29 As to BDR No. 22595, Sand Ridge argues that the BDR explains that staff told Brown he was "in an unassigned area for formal count." But, as stated above, Brown was not accused of, or disciplined for, violating a formal count rule related to that fact. As to BDR No. 22597, Sand Ridge argues that the BDR explains that staff told Brown that he "can't come to the desk to answer questions after curfew." But the incident at issue took place at 4:15 p.m., and Sand Ridge points to no evidence that that time was after curfew; rather, the BDR itself states that his curfew was 10:00 p.m. Moreover, as also stated above, the rule violation for which discipline was imposed did not relate to curfew.

¶30 Sand Ridge argues that the administrative regulation does not specify that the BDR must document a patient's prior notice of the rule and the facts supporting the accusation that the patient violated the rule. We agree, but the issue here is that nothing in the record establishes notice of the accusations sufficiently before the hearing to allow Brown to present a non-perfunctory response to those accusations at the hearing.

¶31 In sum, Sand Ridge fails to show that it correctly applied WIS. ADMIN. CODE § DHS 94.24(2)(g) when it imposed discipline in BDR No. 22595 and BDR No. 22597.

**CONCLUSION**

¶32     For the reasons stated, we reverse and remand to the circuit court with directions to grant the petition and reverse the decisions in BDR No. 22595 and BDR No. 22597.

*By the Court.*—Order reversed and cause remanded with directions.

Not recommended for publication in the official reports.