COURT OF APPEALS
DECISION
DATED AND FILED

**November 4, 2025**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2023AP1445**

STATE OF WISCONSIN

Cir. Ct. No.  2022CV132

**IN COURT OF APPEALS
DISTRICT III**

JESSICA MCCARTHY TRUST,

　　PETITIONER-APPELLANT,

　V.

DEPARTMENT OF NATURAL RESOURCES,

　　RESPONDENT-RESPONDENT.

---

APPEAL from an order of the circuit court for Door County: D. TODD EHLERS, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1　PER CURIAM. The Jessica McCarthy Trust ("the Trust") appeals an order denying its petition for judicial review of a decision of the Wisconsin

Department of Natural Resources (DNR), which denied the Trust's application for a permit to construct a solid pier. The Trust argues that its application satisfied the applicable statutory criteria for the construction of a solid pier and that the DNR's "policy against private solid piers exceeds its lawful authority."

¶2 We conclude that the DNR did not err by denying the Trust's application for a solid pier permit because the Trust failed to meet its burden to show that its proposed pier would not be detrimental to the public interest. We further conclude that the DNR's decision did not rely on a "policy against private solid piers." We therefore affirm the circuit court's order denying the Trust's petition for judicial review of the DNR's decision.

## BACKGROUND

¶3 This case involves an application for a permit to construct a solid pier on the lakebed of the Bay of Green Bay in Door County. Pursuant to statute, a solid pier is defined as "a pier that does not allow for the free flow of water beneath the pier." WIS. STAT. § 30.12(3m)(d)1. (2023-24).[1]

¶4 In the mid-1990s, faced with an "increasing number of permit applications for the placement of permanent solid dock structures" in Door County, the DNR conducted an environmental assessment (hereinafter, "the Solid Pier EA" or "the EA") regarding "the cumulative physical, biological,

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

The Wisconsin Administrative Code similarly defines a solid pier as "a structure, not allowing for the free flow of water beneath, extending into the water from the shore to serve as an aid to navigation." WIS. ADMIN. CODE § NR 326.03(12) (Nov. 2024). All references to WIS. ADMIN. CODE ch. NR 326 are to the November 2024 register.

socio-economic, and aesthetic impacts of permanent solid pier structures on the bed of Green Bay." The Solid Pier EA highlighted a number of concerns related to these impacts.

¶5 For instance, the EA noted that solid piers alter the "natural scenic beauty" of the shoreline. Solid piers also "consume a large amount of lakebed for private purposes," which can create "user conflicts in the near shore area" when "[s]kiers, snowmobilers, canoers, kayakers, fishermen, swimmers and waders are forced into deeper water to get around the solid piers." The EA also concluded that the construction of solid piers disturbs the littoral zone—that is, "the area from the shoreline out to water depths of about eight feet"—because "[a]ccretion and erosion take place on adjacent shorelines," "[a]quatic species which use and depend on the near shore area are disturbed, displaced, or buried," and "[s]urvivors are forced to move elsewhere, sometimes into deeper water." The EA acknowledged, however, that such concerns could potentially be mitigated by "[e]ngineering designs which allow for the littoral drift[2] to move naturally" and that "[s]panning portions of the littoral zone to allow for constant water flow can partially compensate for the blockage of the littoral transport."

¶6 The Solid Pier EA expressly stated that its purpose was not "to block future shoreline developments." Nevertheless, the Trust asserts—and the DNR does not specifically dispute—that no new solid piers have been permitted by the DNR in the area covered by the Solid Pier EA since its issuance.

---

[2] "Littoral drift" is "the sedimentary material which moves in the zone of waves breaking on the shore because of waves and current." WIS. ADMIN. CODE § NR 326.03(5).

¶7    Turning to the specific facts of this case, the Trust owns an approximately two-acre property in the Town of Gibraltar in Door County. The property has approximately 200 feet of Green Bay shoreline within an area known as Juddville Bay. In 2012, the Trust constructed "a steel frame, pipe-supported dock" with composite decking—i.e., a non-solid pier—which was exempt from DNR permitting requirements. However, that pier was destroyed in 2018 by "[w]ave and ice action."

¶8    In June 2020, the Trust contacted the DNR to inquire about constructing a solid pier at its property. A DNR employee informed the Trust "that new solid piers are not likely to be permitted," but she subsequently reached out to colleagues for additional information "regarding the resources here." A series of communications between DNR employees and the Trust's representatives followed. In those exchanges, the DNR raised concerns about the Trust's proposal for "a solid dock with sheet piles and rip rap surrounding," emphasizing the fluctuating water levels on Lake Michigan and the need to ensure the adequate movement of littoral drift.

¶9    Representatives from the DNR and the Trust met in September 2020 to discuss the Trust's proposed solid pier. During that meeting, the Trust explained that it sought to dock a 50-foot or 60-foot boat and believed that a solid pier was the "only option," given the destruction of its previous non-solid pier. The DNR's representatives, on the other hand, expressed concern about the size of the proposed pier's footprint, which they characterized as "extreme." They also emphasized that Juddville Bay is a "unique area with fisheries and habitat"—particularly habitat for smallmouth bass.

¶10 In March 2022, the Trust submitted a permit application for a solid pier. It proposed an L-shaped pier with a "main dock" length of 147 feet, an "L" section 72 feet long, and a dock width of 12 feet. In addition, the Trust proposed adding rip rap around the outside of the pier, which would add 12 to 19 feet to the structure's overall width. In response to the DNR's concerns regarding littoral drift, the Trust proposed including a 50-foot "span" from the shore to the solid section of the pier that was intended to allow water to pass underneath. The Trust's proposal also included a "breakwater" structure, running parallel to the main length of the pier, that was to be 55 feet long and 16 feet wide, with two corrugated steel culverts allowing water to pass through. Additionally, the proposal involved a significant area of dredging between the pier and the breakwater. The DNR calculated that, in total, the proposed pier and breakwater would "privatize 5,248 square feet of public lakebed," and the entire project, "including the proposed structures and future planned dredging," would affect "11,473 square feet of public lakebed."

¶11 The DNR subsequently wrote to the Trust stating that additional information was needed to complete the permit review process. In particular, the DNR sought information about how the sizes of the openings in the pier and breakwater were determined and how the openings were "determined to be adequate to pass littoral drift." The DNR also questioned the representation in the Trust's proposal that littoral drift "is not an issue in this area," noting that "[a]erial photos show evidence of a scrape and/or dredging at the project site, which would indicate there is accretion of materials along the shoreline." In addition, the DNR questioned the need for the breakwater, which would further impact littoral drift. The DNR also asked the Trust to provide additional information regarding other topics, as well as "plans with scale for reference."

¶12     The Trust responded to the DNR's letter, providing scale plans and some additional information. In response to the DNR's question about the sizes of the openings in the pier and breakwater, the Trust stated:

> The littoral zone in this part of Green Bay typically extends 50 to 75 feet from shore. Based on that zone size, a 50-ft long bridge span is proposed for the main dock. The dual culverts on the south breakwall have an interior bottom width of 8.2 feet in total. This represents an opening of 17.5% of the total length of the breakwall. In addition, water flow will occur between the end of the breakwall and the end of the dock, a 52-ft opening. The entire bridge span and culverts will be installed below the ordinary high-water mark.

¶13     The DNR denied the Trust's permit application in August 2022, determining that the proposed solid pier would "not be consistent with the public interest in the navigable waters." More specifically, the DNR determined that the proposed pier would privatize a portion of public lakebed; would be an obstruction to navigation; would adversely impact fish; would adversely impact littoral drift and water quality; would contribute to the cumulative impacts of similar projects; and would adversely affect adjoining riparian owners.

¶14     The Trust sought judicial review of the DNR's decision under WIS. STAT. ch. 227. The circuit court denied the Trust's petition. The court rejected the Trust's argument that the DNR denied the Trust's permit application based on "a de facto policy that all solid piers of the type the [Trust] has proposed in this area of Door County are summarily and categorically denied." To the contrary, the court concluded that the DNR's decision was "supported by articulable and site[-]specific facts." The court further concluded that the Trust had not "met its burden to show that its proposed solid pier complied [with] the criteria established in [WIS. STAT. ch.] 30."

¶15   The Trust now appeals the circuit court's order denying its petition for judicial review of the DNR's decision.

## DISCUSSION

¶16   On appeal, we review the decision of the DNR, not the circuit court. ***Sterlingworth Condo. Ass'n v. DNR***, 205 Wis. 2d 710, 720, 556 N.W.2d 791 (Ct. App. 1996). Unless we find "a ground for setting aside, modifying, remanding or ordering agency action or ancillary relief under a specified provision of" WIS. STAT. § 227.57, we must affirm the DNR's decision. *See* § 227.57(2).

¶17   Where, as here, the DNR's decision "depends on facts determined without a hearing," we will "set aside, modify or order agency action if the facts compel a particular action as a matter of law," or we may "remand the case to the [DNR] for further examination and action within the [DNR's] responsibility." *See* WIS. STAT. § 227.57(7). "Where there is no hearing … the question on review is not whether the agency can produce substantial evidence to support its decision, but rather whether the facts compel a particular result as a matter of law." ***Koll v. DOJ***, 2009 WI App 74, ¶6, 317 Wis. 2d 753, 769 N.W.2d 69 (citation modified).

¶18   As to the DNR's legal conclusions, we will "set aside or modify the agency action" if we conclude that the DNR "has erroneously interpreted a provision of law and a correct interpretation compels a particular action." *See* WIS. STAT. § 227.57(5). We "accord no deference to the [DNR's] interpretation of law." *See* § 227.57(11). Nevertheless, we accord "due weight" to "the experience, technical competence, and specialized knowledge of the [DNR], as well as discretionary authority conferred upon it." *See* § 227.57(10).

¶19     Finally, we will "reverse or remand the case to the [DNR]" if we conclude that the DNR's

> exercise of discretion is outside the range of discretion delegated to the [DNR] by law; is inconsistent with [a DNR] rule, an officially stated [DNR] policy or a prior [DNR] practice, if deviation therefrom is not explained to the satisfaction of the court by the [DNR]; or is otherwise in violation of a constitutional or statutory provision.

See WIS. STAT. § 227.57(8). However, this court "shall not substitute its judgment for that of the [DNR] on an issue of discretion." See *id.*

## I. The DNR properly denied the Trust's permit application based on its determination that the proposed solid pier would be detrimental to the public interest.

¶20     "Any analysis of agency actions affecting the state's navigable waters 'must start with the public trust doctrine.'" *Clean Wis., Inc. v. DNR*, 2021 WI 72, ¶12, 398 Wis. 2d 433, 961 N.W.2d 611 (citation omitted). The public trust doctrine "recognizes that the state holds beds of navigable waters in trust for all Wisconsin citizens." *Gillen v. City of Neenah*, 219 Wis. 2d 806, 820, 580 N.W.2d 628 (1998). "Regulation and enforcement of this public trust rests with both the legislature and the DNR." *ABKA Ltd. P'ship v. DNR*, 2002 WI 106, ¶12, 255 Wis. 2d 486, 648 N.W.2d 854. "The legislature has delegated to the DNR broad authority to regulate under the public trust doctrine and to administer [WIS. STAT.] ch. 30." *Id.*

¶21     WISCONSIN STAT. § 30.12, the statute at issue in this appeal, governs the placement of structures on the beds of navigable waters. The statute provides that "[u]nless an individual or a general permit has been issued under this section or authorization has been granted by the legislature," no person may "place any structure upon the bed of any navigable water where no bulkhead line has been

established" or "place any structure upon the bed of any navigable water beyond a lawfully established bulkhead line." Sec. 30.12(1)(a)-(b). As relevant here, the DNR

> shall issue an individual permit to a riparian owner for a structure … if [it] finds that all of the following requirements are met:
>
> 1. The structure … will not materially obstruct navigation.
>
> 2. The structure … will not be detrimental to the public interest.
>
> 3. The structure … will not materially reduce the flood flow capacity of a stream.

Sec. 30.12(3m)(c). Section 30.12 "authorize[s] the DNR to weigh the relevant policy factors" when deciding whether to issue a permit, including "the desire to preserve the natural beauty of our navigable waters, to obtain the fullest public use of such waters, including but not limited to navigation, and to provide for the convenience of riparian owners." *Sterlingworth Condo. Ass'n*, 205 Wis. 2d at 724-25 (citation omitted).

¶22 WISCONSIN STAT. § 30.12 also grants the DNR authority to "promulgate rules that limit the issuance of individual permits for solid piers." Sec. 30.12(3m)(d)2. However, "[t]he rules may not prohibit the issuance of individual permits for solid piers used for private or commercial purposes." *Id.* The parties agree that § 30.12(3m)(d)2. gives the DNR authority to promulgate rules regulating the issuance of solid pier permits, but it prohibits the DNR from promulgating any rule that categorically prohibits the issuance of such permits.

¶23 Consistent with the grant of authority in WIS. STAT. § 30.12(3m)(d)2., the DNR has enacted a regulation stating that solid piers "shall be provided with a sufficient opening to provide for the passage of littoral drift"

and that "[t]he opening size shall be adequate to prevent the deposition of littoral drift considering wave energy, littoral drift supply and near-shore water depths." WIS. ADMIN. CODE § NR 326.04(3)(b). DNR regulations also state that piers, generally, "shall not totally enclose any portion of a navigable waterway"; "shall not unreasonably obstruct navigation or otherwise interfere with public rights in navigable waters"; "shall not interfere with the rights of other riparians"; and "shall not interrupt the free movement of water nor cause the formation of land by deposition of littoral drift upon the bed of the water." Sec. NR 326.04(4)-(7).

¶24    Importantly, an applicant for a permit under WIS. STAT. § 30.12 "assume[s] the burden of proving that its proposal would not be detrimental to the public interest." *Sterlingworth Condo. Ass'n*, 205 Wis. 2d at 726. In this case, the DNR concluded that the Trust had failed to meet its burden. The record supports the DNR's determination in that regard, and the facts do not compel a contrary result as a matter of law. *See* WIS. STAT. § 227.57(7); *Koll*, 317 Wis. 2d 753, ¶6.

*A. Detrimental effects on aquatic life*

¶25    In its decision, the DNR found that the Trust's proposed pier would have a detrimental effect on aquatic life at the project site. The DNR noted that the location of the proposed pier, Juddville Bay, is a popular fishery area for multiple species of gamefish—including smallmouth bass, yellow perch, and walleye—and provides important habitat for those species. In addition, the DNR explained that Juddville Bay "has habitat characteristics important to panfish species such as rock bass as well as for forage (minnow) species" and "supports a multitude of other aquatic organisms that are key to the overall ecological function of a typical riparian zone."

10

¶26    As to smallmouth bass, specifically, the DNR noted that Juddville Bay has characteristics that provide "very good conditions for smallmouth bass spawning," including "good substrate, shallow water and some protection from wave energy." During a visit to the site on June 7, 2022, the DNR observed smallmouth bass spawning and nesting in the proposed project area and in the area adjacent to it. The Trust acknowledged in its submissions to the DNR that "the eastern shore of Green Bay is a world class smallmouth bass fishery" and that smallmouth bass fishing "accounted for roughly $264 million annually, much of which was spent in Door County." Consistent with those acknowledgements, the DNR observed multiple anglers using the area during its site visit.

¶27    The DNR further noted that "[t]here are presently several extensively dredged areas and solid structures in the immediate vicinity [of the proposed pier] that result in direct loss of habitat for fish and other aquatic organisms, most apparently nesting smallmouth bass." Relying on the Solid Pier EA, the DNR stated that the construction of such solid structures on the lakebed eliminates the preferred habitat for "[i]ndividual species within benthic communities"[3] and that the resultant changes to a benthic community's "structure and diversity may have significant implications to the fisheries' community which relies on richness and diversity of the benthic community."

¶28    Additionally, the DNR specifically noted during its site visit that the lakebed within the proposed project area had a "mix of rock substrates including smaller rubble and gravel with various sizes of cobble and larger boulders

---

[3] "Benthic" means "of, relating to, or occurring at the bottom of a body of water." *Benthic*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/benthic (last visited Oct. 2, 2025).

interspersed throughout," with a water depth of three to four feet. These observations were significant because, as the Solid Pier EA explains, "the shallow water area encompassing three feet or less (the littoral zone) is the more crucial habitat affecting lake productivity and biodiversity," as "shallow water areas provide important spawning, nursery and life sustaining functions for a myriad of fish, water fowl, and other aquatic organisms." Consequently, the Solid Pier EA explained that "[e]xtensive pier and seawall construction destroys and fragments aquatic plant communities along with beneficial life cycle and food producing habitats," which "reduce[s] fish production." Thus, solid structures negatively affect the "fish community" by "the direct loss of natural spawning, nursery and food production areas in the littoral zone."

¶29 The Solid Pier EA further noted that smallmouth bass, in particular, prefer "gravel to rubble areas" for spawning and most commonly nest in "3 to 8 feet of water"—in other words, the same conditions that the DNR observed at the proposed project site. The Solid Pier EA acknowledged that smallmouth bass "do use manmade structures … to locate nests," but it concluded that such use does not "mitigate[]" the "permanent loss of spawning areas" caused by such structures.

¶30 Based on its observations at the proposed project site and background information provided by the Solid Pier EA, the DNR concluded that the Trust's proposed solid pier would have a detrimental impact on aquatic life— specifically, the "fisheries' community" in Juddville Bay. The record supports this determination and does not compel a contrary result as a matter of law. *See* WIS. STAT. § 227.57(7); *Koll*, 317 Wis. 2d 753, ¶6.

¶31 On appeal, the Trust argues that, contrary to the DNR's determination, the "anticipated impact" of its proposed pier on "Green Bay's fish

12

population" is "small" and is "as likely to be a net-positive as [a net-]negative." In support of these assertions, the Trust notes that its consultant "estimated that there are 1,230 acres of suitable smallmouth bass habitat from the western tip of Egg Harbor to the Liberty Grove Boat ramp in Ellison Bay" and that the Trust's proposed pier "would impact roughly only 0.0008% of this area." The Trust also contends that "the substrate loss resulting from this project would be minimal" and that the presence of other solid piers along the eastern shore of Green Bay "has not negatively impacted this world-class smallmouth bass fishery."

¶32 The Trust's arguments in this regard are unpersuasive. While the Trust attempts to minimize the anticipated impact of its pier by asserting that about 1,230 acres of smallmouth bass habitat exist along the shore of Green Bay in Door County, the Trust's consultant defined "[s]uitable habitat" as extending 200 feet from shore and including water depths of up to 15 feet. As discussed above, however, the DNR determined that the key habitat for smallmouth bass nesting and early development—and for the support of corresponding food sources—is more restricted, typically involving areas much closer to shore and ranging from three to eight feet in depth. The Trust's proposed pier would impact exactly that type of sensitive habitat.

¶33 Additionally, while the Trust contends that its proposed pier would cause "minimal" substrate loss, that unsupported assertion is at odds with the DNR's determination that the project would disturb 11,473 square feet of lakebed. Moreover, the Trust cites no evidence in support of its claim that the presence of other solid piers along the shore of Door County has not negatively affected the smallmouth bass fishery. And, while the Trust claims that solid piers may actually be beneficial to the smallmouth bass population, the DNR considered that possibility in the Solid Pier EA but ultimately determined that the potential

positive effects of solid piers would not "mitigate[]" the "permanent loss of spawning areas."

¶34 In all, the Trust has not met its burden to show that its proposed pier "would not be detrimental to the public interest" due to its negative effects on aquatic life. *See **Sterlingworth Condo. Ass'n***, 205 Wis. 2d at 726.

*B. Detrimental effects on littoral drift and water quality*

¶35 The DNR also concluded that the proposed pier would be detrimental to the public interest due to its adverse impacts on littoral drift and water quality. As noted above, littoral drift is "the sedimentary material which moves in the zone of waves breaking on the shore because of waves and current." WIS. ADMIN. CODE § NR 326.03(5). By rule, "[s]olid piers shall be provided with a sufficient opening to provide for the passage of littoral drift," and piers, in general, "shall not interrupt the free movement of water nor cause the formation of land by deposition of littoral drift upon the bed of the water." WIS. ADMIN. CODE § NR 326.04(3)(b), (7).

¶36 Here, the DNR found that the Trust's proposed pier would adversely impact littoral drift and water quality by interrupting "[n]earshore water circulation and flow dynamics." In support of that finding, the DNR specifically noted that similar projects in the area showed "evidence of accretion and scour around the structures." Accretion occurs when sediment accumulates on one side of a structure, and scour refers to the "corresponding erosion on the downdrift side."

¶37 The record shows that during the permit review process, the DNR notified the Trust that "[a]erial photos show evidence of a scrape and/or dredging

at the project site, which would indicate there is accretion of materials along the shoreline." During its subsequent site visit, the DNR found that the lakebed in the project area consisted of "a mix of rock substrates including smaller rubble and gravel with various sizes of cobble and larger boulders interspersed throughout." Notably, DNR had previously concluded in the Solid Pier EA that cobble "is not stationary and is subject to littoral drift forces." The EA also noted that "[w]here solid structures have been placed, photographic evidence shows accumulation of littoral sands in areas that are predominantly cobble." In addition, the EA observed that "cobblestone moves in response to storm action," which can result in "significant" accretion. As a result, the EA cautioned that "great care must be taken to protect neighboring property owners from accretion activities caused by solid structures."

¶38    In addition, with respect to water quality, the DNR noted in its decision that "[s]econdary impacts are expected for the long-term maintenance of addressing accumulated sediments by dredging, which act as a sediment sink that accumulates with algae and that negatively impacts water quality." The DNR also found that past permitted solid structures have negatively affected water quality by limiting "water circulation," which "increases water temperatures" and "oxygen demand." The DNR also noted that solid piers can affect water quality due to "[a]dditional macrophyte and algae populations adjacent to the structures from increased sedimentation by impacted littoral drift." Based on a prior site inspection at a neighboring property, the DNR found that the Trust's property "also has the potential for macrophyte growth later in the summer."

¶39    Thus, the DNR found, based on site-specific observations coupled with its prior conclusions in the Solid Pier EA, that the Trust's proposed pier

would negatively affect both littoral drift and water quality at the project site. The Trust's arguments that the DNR erred in this regard are unavailing.

¶40 The Trust relies on the fact that its pier proposal included a 50-foot opening between the shore and the solid portion of the L-shaped pier. The Trust asserts that this opening "will allow water to pass through which will collectively provide more than adequate accommodation for any natural littoral drift that might occur along the shoreline." The Trust's permit application, however, failed to explain why the proposed 50-foot opening would be sufficient to allow for adequate movement of littoral drift. As the DNR notes, the 50-foot opening assumes "uniform nearshore flow/material transport," which is "not always the case on [Green Bay]." The documents that the Trust submitted in support of its permit application did not explain how the Trust determined that a 50-foot opening would be sufficient, given the actual conditions at the project site.

¶41 Additionally, while the Trust's proposal included the placement of 2 culverts in the breakwater directly across from the 50-foot opening in the pier, the Trust did not provide any evidence showing that the culverts would be sufficient to allow adequate movement of littoral drift. As the DNR notes, the Trust provided "no engineering or other basis for concluding that the combination of the pier and the breakwater would allow for proper pass-through of littoral materials as opposed to creating a combined barrier that would lead to accretion on one end and starvation on the other."

¶42 The Trust also emphasizes that its "professional consultants" concluded "that there is and will be little or no littoral drift at the project location because the substrate consists of primarily large rocks with minimal fine particulate material and that area near-shore currents are inadequate to mobilize

the substrate materials that are present." The report that the Trust cites in support of this proposition, however, provides no evidence in support of its conclusory assertion that the currents at the project site are inadequate to move the substrate materials.

¶43 Moreover, the Trust's consultants' conclusion that littoral drift will not occur at the project site is directly contrary to the DNR's findings in the Solid Pier EA that "[w]here solid structures have been placed, photographic evidence shows accumulation of littoral sands in areas that are predominantly cobble" and that, as a general matter, cobble "moves in response to storm action." In addition, the DNR's site visit showed that the lakebed at the project site consisted of not just large cobble but also "smaller rubble and gravel." The DNR also noted that there were "similar projects in the area with evidence of accretion and scour around the structures," which supported a determination that the movement of littoral drift was, in fact, a concern at the project site.

¶44 The Trust similarly asserts that the 50-foot opening in its proposed pier, combined with the culverts in the breakwater, will be sufficient to "facilitate 'freshwater flow through and around [the pier]' to 'help maintain water temperature, dissolved oxygen and nutrient availability to the areas inside the solid pier.'" Again, though, the Trust has provided no analysis or study showing that the opening and culverts will actually allow adequate water flow so that the solid pier will not negatively affect water and lakebed quality at the project site.

¶45 Ultimately, it was the Trust's burden, as the permit applicant, to show that its proposed solid pier would not be detrimental to the public interest. *See Sterlingworth Condo. Ass'n*, 205 Wis. 2d at 726. For the reasons explained

above, with respect to the DNR's determinations regarding littoral drift and water quality, the Trust failed to meet its burden.

## C. Detrimental effects on public users

¶46 In assessing whether the Trust's proposed solid pier would be detrimental to the public interest, the DNR also properly considered the pier's impact on public users of Juddville Bay. *See id.* at 724 (stating that WIS. STAT. § 30.12 allows the DNR to consider, among other things, the public policy interest in obtaining "the fullest public use" of public trust waters (citation omitted)). The DNR found—and the Trust does not dispute—that the Trust's proposal would "privatize 5,248 square feet of public lakebed" and, including dredging, would affect "11,473 square feet of public lakebed." Citing the Solid Pier EA, the DNR further observed that "[t]he construction of structures which create a partial enclosure of navigable waters has in the past created the illusion and perception of private ownership of these waters of the [s]tate," which has "created user conflicts between the owners of the structures and persons wishing to navigate on the waters enclosed by them." In particular, the DNR noted that solid piers are an obstruction to "small boats troll[ing] the near shore area." The DNR also noted that it observed "multiple anglers" during its visit to the project site.

¶47 The Trust attempts to downplay the size of its project, characterizing the proposed structures as "small" and as representing "approximately one-tenth of an acre in one of the largest freshwater bodies on the planet." Neither the DNR nor this court, however, is required to accept that characterization of the project, particularly in light of the undisputed evidence summarized above regarding the project's scale.

¶48    The Trust also asserts that its proposed pier is "no larger than needed to withstand the natural forces of the area."  As the DNR has noted, however, "[m]any riparians use temporary flow through piers which are put in and taken out annually," and "these piers seem to work satisfactorily."  The Trust does not address whether a removable pier would, in fact, serve its needs.  Notably, while the Trust asserts that its prior, non-solid pier was inadequate because it was destroyed by wave and ice action, a removable pier—which would be taken out of the water in the winter—would avoid that problem.  In this respect as well, the Trust has failed to meet its burden to show that its proposed pier would not be detrimental to the public interest.  *See id.* at 726.

### D.  Cumulative impacts of solid piers

¶49    Finally, the DNR also properly considered the cumulative impacts of solid piers along Door County's Green Bay shoreline when determining that the Trust's proposed pier would be detrimental to the public interest.  Our supreme court has confirmed that when assessing whether a particular project would be detrimental to the public interest, it is appropriate to consider the cumulative impacts of similar projects.  *See Hixon v. PSC*, 32 Wis. 2d 608, 631-32, 146 N.W.2d 577 (1966).  As the court explained in *Hixon*:

> There are over 9,000 navigable lakes in Wisconsin covering an area of over 54,000 square miles.  A little fill here and there may seem to be nothing to become excited about.  But one fill, though comparatively inconsequential, may lead to another, and another, and before long a great body of water may be eaten away until it may no longer exist.  Our navigable waters are a precious natural heritage; once gone, they disappear forever.

*Id.*  This court has similarly stated:

> Although nine additional boat slips may seem inconsequential …, we approach it differently.  Whether it

> is one, nine or ninety boat slips, each slip allows one more boat which inevitably risks further damage to the environment and impairs the public's interest in the lakes. The potential ecological impacts include direct impacts on water quality and sediment quality alteration, as well as direct and indirect influences on flora and fauna. For this very reason, the consideration of "cumulative impact" must be taken into account.

*Sterlingworth Condo. Ass'n*, 205 Wis. 2d at 721.

¶50 Consistent with these authorities, the DNR properly considered the cumulative impacts of solid piers along Door County's Green Bay shoreline. For instance, the DNR noted that "[t]here are presently several extensively dredged areas and solid structures in the immediate vicinity" of the project site "that result in direct loss of habitat for fish and other aquatic organisms, most apparently nesting smallmouth bass." These considerations further supported the DNR's determination that the Trust's proposed pier would be detrimental to the public interest, and the Trust did not meet its burden to show otherwise.

### E. Ultimate determination that the proposed pier would be detrimental to the public interest

¶51 As explained above, the DNR had at least four bases for its determination that the Trust's proposed pier would be detrimental to the public interest. In reaching that conclusion, the DNR relied on its observations regarding the project site and used prior studies, including the Solid Pier EA, to aid it in interpreting those observations. It was the Trust, not the DNR, that had the burden to show that the proposed pier would not be detrimental to the public interest, and the Trust failed to meet its burden. Consequently, the DNR acted within its discretionary authority by denying the permit, and we will not "not substitute [our] judgment for that of the [DNR]" with respect to this issue. *See* WIS. STAT. § 227.57(8).

20

## II. The DNR did not apply a policy against private solid piers when denying the Trust's permit application.

¶52     The Trust argues that the DNR "as a matter of policy, prohibits private solid piers on the bed of Green Bay along the shoreline in Brown, Door and Kewaunee Counties based on the Solid Pier EA." The Trust further asserts that the DNR applied this policy when denying the Trust's application for a solid pier permit. The Trust notes, however, that the legislature has expressly prohibited the DNR from promulgating rules that categorically "prohibit the issuance of individual permits for solid piers used for private or commercial purposes." *See* WIS. STAT. § 30.12(3m)(d)2. The Trust therefore asserts that the DNR exceeded its lawful authority by denying the Trust's permit application based on its policy prohibiting solid piers.

¶53     The DNR's decision belies this assertion, as it shows that the DNR did not apply an unlawful, categorical ban on solid piers but instead determined, based on the specific facts of this case, that the Trust's proposed solid pier would be detrimental to the public interest. As discussed above, in reaching its decision, the DNR relied on the specific characteristics of the project site and observations that the DNR made during its site visit. The DNR then referenced the Solid Pier EA and other scientific studies when interpreting its site-specific observations in order to determine whether the Trust's proposed pier would be detrimental to the public interest. The Trust concedes that, in reaching its decision, the DNR could properly use the Solid Pier EA as a "reference document" that provided "methodologies and tools to evaluate impacts." The DNR's decision shows that this is precisely what the DNR did. As such, we reject the Trust's argument that the DNR exceeded its authority by applying a policy prohibiting solid piers.

21

¶54 In support of its argument that the DNR applied such a policy, the Trust cites various emails written by DNR staff members. As the DNR correctly notes, however, "Emails are not the subject of judicial review and have no legal force …. No statement in an email can change the bases for [the] DNR's actual decision and what is subject to review here." We agree with the DNR that, regardless of what DNR employees may have stated in emails, the "DNR's actual decision—the decision subject to this judicial review—properly evaluated the [Trust's] application, addressed site-specific impacts, and denied the application not based on a categorical ban but rather based on multiple factual reasons why the pier was not in the public interest."

¶55 In addition, even if we considered the staff emails cited by the Trust, we agree with the DNR that they do not support the Trust's assertion that the DNR denied the permit application based on a policy prohibiting solid piers. For instance, the Trust cites one email in which a staff member referred to a "solid pier policy." However, the email's author—who was not the individual who ultimately denied the Trust's permit application—did not further describe the so-called "solid pier policy," and he acknowledged his own "knowledge gaps" regarding the subject. Moreover, the email's author emphasized the need for "detailed specific observations" and suggested "tak[ing] a boat ride to evaluate the actual impacts, take documentation, and describe the affected environment." As such, this email actually cuts against the Trust's argument that the DNR applied a blanket policy prohibiting solid piers.

¶56 The Trust also quotes another email—this one written by the individual who ultimately denied the permit application—as stating that "we have an Environmental Assessment for solid structures that we have used to defend 'no new solid structures…'" The actual quotation from the email, however, is: "While

we have an Environmental Assessment for solid structures that we have used to defend 'no new solid structures[,]' *we will need to identify site specific qualities as well.*" (Emphasis added.) The email further states: "We have been invited to do a site visit as the next step, and I encourage you to come with." Again, rather than supporting the Trust's argument that the DNR applied a blanket policy prohibiting solid piers, this email actually shows that the DNR understood the need to consider the specific facts surrounding the Trust's application.

¶57 The Trust also cites another email, in which a DNR employee stated that "[s]olid piers in this stretch of Door County are rare and have not been permitted since the 1990's report on the area"—i.e., the Solid Pier EA. The Trust, however, ignores the following language from the same email:

> A solid pier does not allow for natural water flow to continue along that stretch of shoreline which then creates areas or zones which become less or non-productive. *Adding in a way to pass littoral drift would be mandatory in order for this to be considered a complete permit application as well as engineering and even modeling to show that the opening is adequate to pass littoral drift.*

(Emphasis added.) This additional language again shows that the DNR was not applying a blanket policy prohibiting solid piers but, instead, was willing to consider granting a solid pier permit where the proposal adequately addressed the passage of littoral drift.

¶58 We therefore reject the Trust's argument that the DNR applied a blanket policy prohibiting solid piers when it denied the Trust's permit application. Instead, as summarized above, after applying the scientific principles set forth in the Solid Pier EA to the specific facts of this case, the DNR made an individualized determination that the Trust's proposed pier would be detrimental

to the public interest. Accordingly, the DNR did not exceed its lawful authority by denying the permit application.[4]

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[4] The Trust also argues that the DNR "violated rulemaking requirements under" WIS. STAT. ch. 227 because its blanket policy prohibiting solid piers constitutes an unpromulgated rule. Because we conclude that the DNR did not apply a blanket policy prohibiting solid piers, we need not address this argument. *See* **Turner v. Taylor**, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (stating that this court need not address all issues raised by the parties if one is dispositive).